CHAMBERS v TRETTCO, INC

Docket No. 114085. Argued April 4, 2000 (Calendar No. 5). Decided
    July 31, 2000.

Robyn Chambers brought an action in the Washtenaw Circuit Court
    against her employer, Trettco, Inc., claiming sex discrimination in
    employment, involving sexual harassment. The court, Donald E.
    Shelton, J., submitted the case to a jury on theories of quid pro quo
    sexual harassment and hostile work environment sexual harass-
    ment. The jury returned a verdict for the plaintiff. The Court of
    Appeals, JANSEN, P.J., and MARKEY, J. (O'CONNELL, J., dissenting),
    affirmed on the basis of *Faragher v Boca Raton*, 524 US 775 (1998),
    and *Burlington Industries, Inc v Ellerth*, 524 US 742 (1998), which
    had applied the federal Civil Rights Act. 232 Mich App 560 (1998)
    (Docket No. 202151). The defendant appeals.

    In an opinion by Justice MARKMAN, joined by Chief Justice
WEAVER, and Justices CAVANAGH, TAYLOR, CORRIGAN, and YOUNG, the
Supreme Court *held*:

    The defendant was entitled to a directed verdict on the plaintiff's
claim of quid pro quo sexual harassment, requiring vacation of the
Court of Appeals opinion and remand to that Court for reconsider-
ation of the plaintiff's claim of hostile environment sexual
harassment.

    1. The Michigan Civil Rights Act, MCL 37.2101 *et seq.*; MSA
3.548(101) *et seq.*, recognizes that, in employment, freedom from
discrimination because of sex is a civil right. Employers are prohib-
ited from violating this right, and discrimination because of sex
includes sexual harassment. "Sexual harassment" is specifically
defined to include unwelcome sexual advances, requests for sexual
favors, and other verbal or physical conduct or communication of a
sexual nature where submission to such conduct or communica-
tion is made a term or condition, either explicitly or implicitly, to
obtain employment, where submission to or rejection of such con-
duct or communication by an individual is used as a factor in a
decision affecting employment (quid pro quo harassment), or
where such conduct or communication has the purpose or effect of
substantially interfering with employment (hostile work environ-
ment harassment).

2. In order to establish a claim of quid pro quo harassment, an employee must demonstrate, by a preponderance of the evidence, subjection to any of the types of unwelcome sexual conduct or communication described in the statute, and that the employer or the employer's agent used submission to or rejection of the proscribed conduct as a factor in a decision affecting employment. In order to establish a claim of hostile work environment harassment, an employee must prove, by a preponderance of the evidence, membership in a protected group, subjection to unwelcome sexual conduct or communication, that the unwelcome sexual conduct or communication was either intended to, or in fact did, substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment, and respondeat superior. Whichever category of sexual harassment is at issue, it is always necessary to determine the extent of the employer's vicarious liability when harassment is committed by an agent. Because the Civil Rights Act expressly defines "employer" to include agents, common-law agency principles are to be relied on in determining when an employer is liable for sexual harassment committed by its employees. Vicarious liability exists in the case of quid pro quo harassment because the quid pro quo harasser, by definition, uses the power of the employer to alter the terms and conditions of employment.

3. An employer is strictly liable only for quid pro quo sexual harassment. In terms of the statute, this means that an agent of the employer must have used submission or rejection of unwelcome sexual conduct or communication as a factor in decisions affecting the plaintiff's employment. By comparison, when the submission to or rejection of unwelcome sexual conduct or communication has not been factored into an employment decision, but a hostile work environment has nevertheless been created because unwelcome sexual communication or conduct substantially interferes with an individual's employment, the violation can only be attributed to the employer if the employer failed to take prompt remedial action after having been reasonably put on notice of the harassment.

4. Although, at times, the Michigan Supreme Court may seek guidance in interpreting the Michigan Civil Rights Act from federal court interpretations of the federal Civil Rights Act, it is not compelled to follow federal interpretations. Adoption of the principles announced by the United States Supreme Court in *Faragher* and *Ellerth*, on which the Court of Appeals relied, would represent a significant change in the approach to determining an employer's vicarious liability for sexual harassment under Michigan law. Specifically, those holdings conflate the concepts of quid pro quo har-

assment and hostile work environment harassment, and shift the burden of proof from the employee to the employer regarding whether the employer should be held vicariously liable for an actionable hostile environment created by a supervisor. The terms "quid pro quo," "hostile work environment," and "sexual harassment" are nowhere found in the federal statute. The Michigan Civil Rights Act expressly includes sexual harassment as a prohibited form of sex discrimination, and further provides detailed definitions for sexual harassment that can be easily identified by the labels "quid pro quo" and "hostile work environment."

5. The trial court erred in not granting the defendant a directed verdict with regard to the plaintiff's quid pro quo claim of sexual harassment. The sine qua non of a quid pro quo harassment claim is a decision affecting the plaintiff's employment. In this case, there was no tangible employment action, adverse or otherwise, that was shown to be causally related to the plaintiff's submission to or rejection of the supervisor's harassment. Because there was no decision affecting the plaintiff's employment, the plaintiff's proofs were insufficient, as a matter of law, to put such a theory of liability at issue.

6. Because the Court of Appeals erroneously failed to apply controlling Michigan legal principles regarding sexual harassment claims brought under Michigan law, and instead applied the federal principles announced in *Faragher* and *Ellerth*, remand is required to the Court of Appeals for reconsideration of the defendant's challenge to the plaintiff's hostile work environment claim under the proper legal framework. The plaintiff's testimony clearly established the existence of a hostile work environment. The central question to be addressed on remand is whether the plaintiff presented sufficient evidence to demonstrate that defendant failed to take prompt and appropriate remedial action after receiving adequate notice that the supervisor was sexually harassing the plaintiff. Notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances would cause a reasonable employer to be aware of a substantial probability that sexual harassment was occurring. The relevant inquiry concerning the adequacy of the employer's remedial action is whether the action reasonably served to prevent future harassment of the plaintiff.

Vacated and remanded.

Justice KELLY, dissenting, stated that the plaintiff established a prima facie case of quid pro quo sexual harassment, pursuant to the Michigan Civil Rights Act and *Champion v Nationwide Security*, 450 Mich 702 (1996). But the majority has misinterpreted *Champion*, and added an element not found in the MCRA.

.

The MCRA specifically includes sexual harassment as a form of discrimination because of sex, and presents two separate theories under which a party may make out a claim for quid pro quo sexual harassment. *Champion* held that under the act a plaintiff must establish that she was subject to any of the types of unwelcome sexual conduct or communication or communication described in the statute, and that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment. It also imposed close to strict liability for such harassment committed by supervisory personnel. According to the majority, in order to establish such a claim, a plaintiff must show the existence of a tangible employment action. However, neither MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii) nor *Champion* requires a plaintiff to prove a tangible employment action in order to proceed with a claim of quid pro quo sexual harassment. Each requires only a showing that the plaintiff's submission or rejection was a factor in a decision affecting her employment. Pursuant to *Champion*, the proper point of focus is the supervisor's conduct, not the plaintiff's or the defendant's actions after the incident.

Because the majority determines that there was no constructive discharge, it concludes that the plaintiff did not suffer a tangible employment action. But, a claim of quid pro quo sexual harassment under the facts of this case is not precluded. A correct application of *Champion* requires the conclusion that the supervisor's decision to make sexual contact with Mrs. Chambers without her consent, in and of itself, was a decision affecting her employment. By focusing on Mrs. Chambers' actions after her employment had been adversely affected, the majority misapplies *Champion*. By giving the supervisor the authority he used to assault Mrs. Chambers, the defendant committed the violation through its agent. The flaw in the majority's overall treatment of this case is that, in analyzing whether the supervisor's conduct was quid pro quo sexual harassment, it focuses on the plaintiff's reaction. As was pointed out in *Champion*, this is incorrect because it blames the victim. Instead, the analysis should concentrate on what defendant and its agent did, comporting with the legislative intent that employers, not the victims of sexual harassment, should bear the costs of remedying and eradicating discrimination.

There is a critical difference between quid pro quo and hostile work environment sexual harassment claims. In quid pro quo claims, the victim's employment must be adversely affected in some manner. In hostile work environment claims, it need not be affected. The majority's assertion that the effect on employment

must be tangible is incorrect. It can be tacit. The supervisor made submitting to his sexual misconduct a term of Mrs. Chambers' employment. He could do this only because defendant gave him supervisory authority over her. Thus, quid pro quo sexual harassment occurs when the employer's agent misuses his supervisory authority in a way that affects a subordinate's employment. In hostile work environment claims, the harasser does not affect the victim's employment. Either, he does not have the authority to do so, or he does not accomplish the harassment through the use of supervisory authority over the victim. To require plaintiffs to prove that they suffered a tangible employment action is to introduce an element that cannot be derived from the statutory language of MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii). The majority creates a loophole in the sexual harassment provisions of the MCRA. It will allow an employer to sexually harass an employee without adverse legal consequences if the employee submits, rather than risk potential job injury. It also places the burden on employees to complain about their supervisor's sexually harassing conduct, rather than encouraging employers to take the initiative to prevent such occurrences.

In taking the position that it matters little to the issue of vicarious liability if, for reasons not attributable to the defendant, the plaintiff was not actually aware of the policy, the majority usurps the role of the jury by deciding that the defendant did communicate the policy to the plaintiff. The evidence presented permitted the jury to infer that the defendant never communicated the policy to the plaintiff. If the jury did so infer, the fact that the defendant had a sexual harassment policy becomes irrelevant. The majority seems to suggest that employees have a duty to discover employers' policies when they begin working.

*Champion* indicates there is a line which, if crossed, results in an automatic imputation to the employer of a supervisor's sexual misconduct, if performed in his capacity as a supervisor. In this case, the supervisor's behavior crossed that line. By finding that it did not, the majority draws an arbitrary distinction between rape and a week of unwelcome sexual contact. This case cannot be distinguished from *Champion*, either, merely because Mrs. Chambers did not quit after her supervisor sexually harassed her. The majority treats employees who continue to work after being sexually harassed by a supervisor differently from those who quit. In so doing, it misinterprets *Champion*. *Champion* makes it clear that it is not the victim's conduct, but the supervisor's conduct, that is scrutinized. The majority's holding shifts responsibility for a decision made by its agent from the employer to the victim. If the vic-

tim does not respond as the majority deems appropriate, she loses her claim of quid pro quo sexual harassment. This position clearly subjects victims of sexual harassment to burdens not contemplated by either *Champion* or the MCRA. It is inappropriate to remand this case to the Court of Appeals to assess the sufficiency of the evidence presented regarding whether defendant had adequate notice of hostile work environment sexual harassment. The jury and the Court of Appeals determined that the evidence was sufficient.

*Garris, Garris, Garris & Garris, P.C.* (by *Steven Z. Garris*), for the plaintiff-appellant.

*C. R. Victor & Associates, P.L.L.C.* (by *Cindy Rhodes Victor*), for the defendant-appellant.

Amici Curiae:

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Angelita Espino*, Assistant Attorney General, for Michigan Department of Civil Rights.

*Pitt, Dowty, McGehee & Mirer, P.C.* (by *Michael L. Pitt* and *Shannon L. Dunn*), for Women's Justice Center.

*Honigman, Miller, Schwartz & Cohn* (by *Cameron J. Evans*) for Michigan Health and Hospital Association.

*The Fishman Group* (by *Steven J. Fishman* and *Thomas A. Pinch*) for Michigan Chamber of Commerce and Michigan Restaurant Association.

*Amberg, McNenly, Firestone & Lee, P.C.* (by *Joseph H. Firestone*), for Michigan Education Association.

*Clark Hill, P.L.C.* (by *Duane L. Tarnacki, Rachelle G. Silberberg*, and *Lira A. Johnson*), for Michigan Manufacturers Association.

*Diane M. Soubly,* Deputy General Counsel, Litigation, Comerica Incorporated, for American Society of Employers.

*Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Mary Katherine Norton* and *Elizabeth A. Cabot*), for Michigan State AFL-CIO and International Union UAW.

MARKMAN, J. We granted leave to consider whether the Court of Appeals properly held an employer vicariously liable under the Civil Rights Act (CRA), MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, for sexual harassment by a supervisory employee against a subordinate employee. A divided Court of Appeals panel affirmed the judgment on a jury verdict returned in plaintiff's favor. The majority utilized vicarious liability principles articulated in two recent United States Supreme Court decisions applying the federal Civil Rights Act. We hold that the principles stated in the federal cases relied on by the Court of Appeals do not apply to claims brought under Michigan's Civil Rights Act. Instead, we adhere to prior Michigan precedent and the specific language of the Michigan statute. We also hold that defendant was entitled to a directed verdict on plaintiff's claim of quid pro quo sexual harassment. Accordingly, we vacate the Court of Appeals opinion and remand to the Court of Appeals for reconsideration of plaintiff's claim of hostile environment sexual harassment in light of this opinion.

I

Defendant Trettco, Inc., a corporation that manages food service operations for a number of businesses,

hired plaintiff as a cook in June 1995, planning to use her in various locations, pending possible placement in a permanent position. Plaintiff was initially assigned to replace a cook who was on medical leave. During her second week in this position, a temporary supervisor, Paul Wolshon, was assigned to cover the duties of the regular on-site supervisor, Jennifer Hostutler, who was on vacation. Wolshon was a "float manager" for defendant, meaning that he moved from location to location working as an interim manager as needed. Wolshon lacked the authority to hire, fire, or discipline other employees. Plaintiff, however, believed that Wolshon had the authority to fire her.

According to the trial testimony, during the four-day period that Wolshon was at the facility,[1] he engaged in a course of offensive conduct toward plaintiff, including rubbing plaintiff's buttocks, grabbing her breasts, and repeatedly propositioning plaintiff for sexual favors. Plaintiff testified that she felt intimidated and threatened by Wolshon's behavior. Defendant had a written sexual harassment policy in its company handbook, which all employees were required to read and sign. The policy defined sexual harassment, explained that persons engaging in sexual harassment were subject to discipline, including immediate termination, and instructed all employees experiencing or witnessing an incident that they considered sexual harassment or discrimination were to report the incident to defendant's vice president. All defendant's managers were also required to attend a yearly management-development seminar that included a segment on sexual-harassment education.

---

[1] Monday of that week was the July 4 holiday.

On Wednesday, July 6, 1995, defendant's regional director, Kevin McLaughlin, called the facility and plaintiff answered the telephone. After sensing something "wrong" in plaintiff's voice, McLaughlin inquired whether there was a problem. Without specifying the nature of the problem, plaintiff indicated that something was wrong and that she needed to talk to him. When McLaughlin sought to get more information over the telephone, plaintiff refused to elaborate. Plaintiff later testified that this was because Wolshon was standing next to her. There was conflicting testimony regarding whether McLaughlin did anything further to determine the nature of the undescribed problem. According to McLaughlin, he called the following day and plaintiff again refused to say what was wrong. Plaintiff testified that he only called on Wednesday. They both agree that McLaughlin said that he would come to the facility on Friday. McLaughlin testified that he did so, but did not speak to plaintiff. Plaintiff and others testified that they did not see him on that day. It is undisputed, however, that at no time during the week did plaintiff ever specifically tell McLaughlin about the sexual harassment perpetrated by Wolshon. Nor did she follow the process outlined in the policy manual for reporting sexual harassment. McLaughlin testified that it never occurred to him that plaintiff might be having problems with her male supervisor.

On the following Monday, when Hostutler returned from vacation, and plaintiff informed her of Wolshon's conduct. Hostutler immediately telephoned McLaughlin and relayed the news. McLaughlin instructed Hostutler to prevent Wolshon from entering the facility, where he was scheduled to work that morning, and to send him directly to the home office. McLaughlin then

commenced an investigation of the incident. He instructed Hostutler to have plaintiff prepare a written statement, which was then submitted to McLaughlin. Shortly thereafter, McLaughlin met with plaintiff and Hostutler, and assured plaintiff that she would never have to work with Wolshon again. Thus, as soon as plaintiff reported the sexual harassment, Wolshon was removed from the facility and plaintiff never again had contact with Wolshon. When the permanent cook returned, plaintiff was transferred to another facility operated by defendant. Plaintiff was eventually discharged in September 1995 when she failed to show up for work for several consecutive days.

Plaintiff then brought suit against defendant, alleging assault, sexual assault, sexual harassment, and retaliatory discharge. Wolshon was not named as a defendant. The trial court dismissed the assault and sexual assault charges on defendant's motion for a directed verdict. Plaintiff voluntarily dismissed her retaliatory discharge claim before the case went to the jury. Thus, plaintiff advances no claim that the discharge had any connection to the sexual harassment. The trial court denied defendant's motions for a directed verdict on plaintiff's claim of sexual harassment, both after plaintiff's proofs and at the close of all the evidence.

The case was submitted to the jury on separate theories of liability—quid pro quo sexual harassment and hostile environment sexual harassment. The jury verdict form required the jury to answer two specific interrogatories corresponding to these theories, and to only proceed to assess damages if it held for plaintiff on either of these two questions. The jury

answered both interrogatories in plaintiff's favor and then assessed damages at $150,000.

## II

Defendant appealed, and the Court of Appeals affirmed in a two-to-one decision.[2] The majority rejected defendant's argument that plaintiff had failed to prove the existence of a hostile work environment, reasoning that the severe and pervasive sexual harassment occurring during Wolshon's week in charge was sufficiently outrageous to qualify as a hostile work environment. With respect to defendant's vicarious liability, rather than analyzing the case pursuant to *Radtke v Everett*, 442 Mich 368; 501 NW2d 155 (1993), the majority adopted *Faragher v Boca Raton*, 524 US 775; 118 S Ct 2275; 141 L Ed 2d 662 (1998), and *Burlington Industries, Inc v Ellerth*, 524 US 742; 118 S Ct 2257; 141 L Ed 2d 633 (1998). In those cases, the United States Supreme Court, applying the federal Civil Rights Act, held:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative

---

[2] 232 Mich App 560; 591 NW2d 413 (1998).

> defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. [*Faragher, supra,* 524 US 807-808; *Ellerth, supra,* 524 US 765.]

The Court of Appeals majority concluded that defendant could properly be found to be vicariously liable, because Wolshon's conduct created a hostile work environment and defendant could not have established the necessary affirmative defense. Regarding defendant's ability to establish an affirmative defense under *Faragher* and *Ellerth*, the majority explained that "the jury could have, and apparently did, reject McLaughlin's testimony and accept plaintiff's testimony regarding defendant's attempts to prevent or correct Wolshon's sexually harassing behavior." 232 Mich App 567. Thus, reasoned the majority, "the jury could reasonably infer that defendant was vicariously liable for Wolshon's sexually harassing behavior because defendant failed to exercise reasonable care to prevent and correct promptly Wolshon's behavior." *Id.* The majority did not address plaintiff's quid pro quo claim because it relied on *Faragher* and *Ellerth* for the proposition "that the labels '*quid pro quo*' and 'hostile work environment' are not controlling for purposes of establishing employer liability." 232 Mich App 562-563 and n 3.

The dissent, asserted that this was not a case of quid pro quo harassment, but only one presenting a claim of hostile environment harassment. It further noted that, in such a case, pursuant to this Court's precedent, a plaintiff must establish that the employer bears the responsibility for the alleged harassment under the doctrine of respondeat superior, which ordinarily requires a showing of either a recurring

problem or that repetition of an offensive incident was likely, and that the employer failed to correct the problem upon receiving notice. *Radtke, supra* at 382, 395. The dissent found that the evidence in this case was insufficient to satisfy that burden.

We granted leave to appeal and directed the parties to address, among other things, whether the principles adopted in *Faragher* and *Ellerth* should apply in cases brought under the Michigan Civil Rights Act. 461 Mich 905 (1999).

III

A

We begin our analysis by reviewing the current principles of Michigan law regarding sexual harassment in employment because this is the law that the trial court and the Court of Appeals were obligated to follow.[3] Through the Civil Rights Act, Michigan law recognizes that, in employment, freedom from discrimination because of sex is a civil right. MCL 37.2102; MSA 3.548(102). Employers are prohibited from violating this right,[4] MCL 37.2202; MSA 3.548(202), and discrimination because of sex includes sexual harassment, MCL 37.2103(i); MSA 3.548(103)(i). In turn, "sexual harassment" is specifically defined to include

---

[3] "[I]t is the Supreme Court's obligation to overrule or modify case law if it becomes obsolete, and until this Court takes such action, the Court of Appeals and all lower courts are bound by that authority." *Boyd v W G Wade Shows*, 443 Mich 515, 523; 505 NW2d 544 (1993).

[4] "A person alleging a violation . . . may bring a civil action for appropriate injunctive relief or damages, or both." MCL 37.2801(1); MSA 3.548(801)(1).

unwelcome sexual advances, requests for sexual favors, and
other verbal or physical conduct or communication of a
sexual nature under the following conditions:

   (i) Submission to the conduct or communication is made
a term or condition either explicitly or implicitly to obtain
employment . . . .

   (ii) Submission to or rejection of the conduct or commu-
nication by an individual is used as a factor in decisions
affecting the individual's employment . . . .

   (iii) The conduct or communication has the purpose or
effect of substantially interfering with an individual's
employment . . . . [MCL 37.2103(i); MSA 3.548(103)(i).]

The statute expressly addresses an employer's vicari-
ous liability for sexual harassment committed by its
employees by defining "employer" to include both the
employer *and* the employer's agents. MCL 37.2201(a);
MSA 3.548(201)(a).

Sexual harassment that falls into one of the first
two of these subsections is commonly labeled quid
pro quo harassment. *Champion v Nation Wide Secur-
ity, Inc*, 450 Mich 702, 708; 545 NW2d 596 (1996).
Sexual harassment that falls into the third subsection
is commonly labeled hostile environment harassment.
*Radtke, supra* at 381. We have previously identified
the elements that a party must establish in order to
make out a claim for sexual harassment with respect
to each of these categories.

In order to establish a claim of quid pro quo harass-
ment, an employee must, by a preponderance of the
evidence, demonstrate:

   (1) that she was subject to any of the types of unwel-
come sexual conduct or communication described in the
statute, and (2) that her employer or the employer's agent
used her submission to or rejection of the proscribed con-
duct as a factor in a decision affecting her employment.
[*Champion, supra* at 708-709.]

In order to establish a claim of hostile environment harassment, an employee must prove the following elements by a preponderance of the evidence:

> (1) the employee belonged to a protected group;
> (2) the employee was subjected to communication or conduct on the basis of sex;
> (3) the employee was subjected to unwelcome sexual conduct or communication;
> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
> (5) respondeat superior. [*Radtke, supra* at 382-383.]

Whichever category of sexual harassment is at issue, it is always necessary to determine the extent of the employer's vicarious liability when harassment is committed by an agent. Because the Civil Rights Act expressly defines "employer" to include agents, we rely on common-law agency principles in determining when an employer is liable for sexual harassment committed by its employees. Vicarious liability exists in the case of quid pro quo harassment because the quid pro quo harasser, by definition, uses the power of the employer to alter the terms and conditions of employment. *Champion, supra.*

By comparison, we have noted that such strict imposition of vicarious liability on an employer "is illogical in a pure hostile environment setting" because, generally, in such a case, "the supervisor acts outside 'the scope of actual or apparent authority to hire, fire, discipline, or promote.'" *Radtke, supra* at 396, n 46 (citations omitted). Hence, we have explained:

> Under the Michigan Civil Rights Act, an employer may avoid liability [in a hostile environment case] "if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." *Downer v Detroit Receiving Hosp,* 191 Mich App 232, 234; 477 NW2d 146 (1991) (applying the standard to a Civil Rights Act claim). See also *Babcock* [*v Frank,* 783 F Supp 800, 809 (SD NY, 1992)]. Such prompt and appropriate remedial action will permit an employer to avoid liability if the plaintiff accuses either a co-worker, *McCarthy v State Farm Ins Co,* 170 Mich App 451, 457; 428 NW2d 692 (1988), or a supervisor of sexual harassment. *McCalla v Ellis,* 180 Mich App 372, 380; 446 NW2d 904 (1989), citing [*Meritor Savings Bank, FSB v Vinson,* 472 US 57, 72; 106 S Ct 2399; 91 L Ed 2d 49 (1986)]; *Downer, supra* at 234. An employer, of course, must have notice of alleged harassment before being held liable for not implementing action. *Katz v Dole,* 709 F2d 251, 255 (CA 4, 1983); *Henson* [*v City of Dundee,* 682 F2d 897, 905 (CA 11, 1982)]. [*Radtke, supra* at 396-397.]

The bottom line is that, in cases involving a hostile work environment claim, a plaintiff must show some *fault* on the part of the employer. That is the essence of *Radtke*'s requirement that a plaintiff prove that the employer failed to take prompt and adequate remedial action upon notice of the creation of a hostile work environment.

Therefore, under current Michigan law, whether analyzing quid pro quo harassment or hostile environment harassment, the question is always whether it can be fairly said that the employer committed the violation—either directly or through an agent. The fact that the answer to that question may differ depending on whether the harassment is of the quid pro quo or hostile environment type is not a result of arbitrary rulemaking, but, rather, is firmly rooted in traditional agency principles.

To summarize, an employer is strictly liable only for quid pro quo sexual harassment. In terms of the statute, this means that an agent of the employer must have used submission or rejection of unwelcome sexual conduct or communication "as a factor in decisions affecting [the plaintiff's] employment." MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii). When the submission to or rejection of the unwelcome sexual conduct or communication has *not* been factored into an employment decision, but a hostile work environment has nevertheless been created because unwelcome sexual communication or conduct substantially interferes with an individual's employment, the violation can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment. *Radtke, supra.*

Against this backdrop of the current state of controlling legal principles regarding sexual harassment under Michigan law, we turn our attention to whether the principles adopted by the United States Supreme Court in *Faragher* and *Ellerth* should now apply in cases brought under the Michigan Civil Rights Act.

B

We are many times guided in our interpretation of the Michigan Civil Rights Act by federal court interpretations of its counterpart federal statute. See, e.g., *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505, 525; 398 NW2d 368 (1986). However, we have generally been careful to make it clear that we are not compelled to follow those federal interpretations. See, e.g., *Radtke, supra* at 381-382. Instead, our primary obligation when interpreting Michigan law is

always "to ascertain and give effect to the intent of the Legislature, . . . 'as gathered from the act itself.' " *McJunkin v Cellasto Plastic Corp*, 461 Mich 590, 598; 608 NW2d 57 (2000). Although there will often be good reasons to look for guidance in federal interpretations of similar laws, particularly where the Legislature has acted to conform Michigan law with the decisions of the federal judiciary, see, e.g., *Koester v City of Novi*, 458 Mich 1, 15-16; 580 NW2d 835 (1998), we cannot defer to federal interpretations if doing so would nullify a portion of the Legislature's enactment. See *Piper v Pettibone Corp*, 450 Mich 565, 571-572; 542 NW2d 269 (1995), quoting *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27-28; 528 NW2d 681 (1995) (ascertaining legislative intent starts with the unambiguous statutory language and, where judicial interpretation is permitted, such interpretation must avoid denying effect to portions of the statute).

If this Court were to adopt the principles announced by the United States Supreme Court in *Faragher* and *Ellerth*, it would represent a significant change in our approach to determining employers' vicarious liability for sexual harassment. Specifically, the holdings issued by the United States Supreme Court in those cases both: (1) conflate the concepts of quid pro quo harassment and hostile environment harassment, and (2) shift the burden of proof from the employee to the employer regarding whether the employer should be held vicariously liable "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher, supra*, 524 US 807; *Ellerth, supra*, 524 US 765. To avoid vicarious liability under this new federal rule, an employer, essentially, must establish affirmatively that it was not negligent

in failing to prevent the harassment and that the victim was negligent in failing to avail herself of opportunities provided by the employer to avoid the harm from such harassment. *Id.*

The Court's decision to conflate quid pro quo sexual harassment and hostile environment sexual harassment was based upon its view of federal law. In *Ellerth,* the Court noted that § 703(a) of title VII provides only that an employer may not discriminate against an individual " 'because of such individual's . . . sex.' 42 USC § 2000e-2(a)(1)." *Ellerth, supra,* 524 US 751-752. The terms "quid pro quo" and "hostile work environment" are nowhere found in the federal statute, nor is "sexual harassment." The Court found that these labels were useful for roughly grouping different types of cases, but, beyond that, they held limited utility. *Id.*

As noted earlier, the Michigan Civil Rights Act expressly includes sexual harassment as a prohibited form of sex discrimination, and further provides detailed definitions for sexual harassment that can be easily identified by the labels "quid pro quo" and "hostile work environment." This stands in contrast to the analogous federal law. Even if we thought it sound policy to blur the distinctions between these types of sexual harassment in order to announce a common rule on vicarious liability that encompasses all sexual harassment, our limited role in interpreting statutes would preclude us from essentially "legislating" in this manner. *McJunkin, supra* at 598; *Piper, supra* at 572. Finally, adopting the principles announced in *Faragher* and *Ellerth* would be inconsistent with our decision in *Radtke,* in which we applied agency principles to hold that it is the plaintiff's burden to prove that the employer failed to take prompt and adequate

remedial action upon reasonable notice of the creation of a hostile environment, even where the harassing conduct is committed by a supervisor.

We find no statutory basis for singling out sexual harassment cases, as opposed to other classes of prohibited discrimination, for the application of a new rule of vicarious liability. For example, in cases brought under the Civil Rights Act alleging disparate treatment on the basis of membership in a protected class, the overall burden of proving the elements of a discrimination claim always remains with the plaintiff (although a framework exists for temporarily placing a burden of production on the defendant). See *Lytle v Malady (On Rehearing)*, 458 Mich 153, 177-178 (WEAVER, J., joined by BOYLE and TAYLOR, JJ.), 185 (BRICKLEY, J., concurring); 579 NW2d 906 (1998); *Town v Michigan Bell Telephone Co*, 455 Mich 688, 695-696 (BRICKLEY, J., joined by BOYLE and WEAVER, JJ.), 707 (RILEY, J., concurring in relevant part); 568 NW2d 64 (1997). Absent some articulable basis in our statutory law for treating sexual harassment claims differently than other forms of discrimination, we see no justification for imposing upon defendants the burden of affirmatively disproving vicarious liability, or conditioning the success of that defense on factors not necessarily rooted in traditional agency principles. Instead, we adhere to the established principles of Michigan law regarding sexual harassment and agency that are summarized in part III(A) of this opinion.

IV

Having established that the legal principles the trial court and the Court of Appeals were obligated to fol-

low are the same principles that control our review of this case, we next address their application by these two courts in this case.

A

We initially note that the trial court erred by not granting defendant a directed verdict with regard to plaintiff's quid pro quo claim of sexual harassment. In *Champion*, we held that the rape of an employee by her supervisor amounted to a constructive discharge. We reasoned that the supervisor's decision to rape the employee, in response to her refusal to comply with his requests for sexual favors, amounted to a decision to discharge her on the basis of her submission to or rejection of those requests. *Champion, supra* at 710-713.

In this case however, there was no tangible (adverse or otherwise) employment action that was shown to be causally related to plaintiff's submission to or rejection of Wolshon's harassment. As explained previously, the sine qua non of a quid pro quo harassment claim is a decision affecting the plaintiff's employment. The tangible employment action in *Champion* was the plaintiff's constructive discharge. Here, there was no termination of employment.[5] As we explained in *Jacobson v Parda Federal Credit Union*, 457 Mich 318, 327; 577 NW2d 881 (1998), "[w]hile an employer's action may lead to a constructive discharge, such a discharge itself generally cannot become evident until the employee has, in fact, left the employment. . . . Until the employee resigns,

---

[5] Plaintiff also fails to demonstrate any other "decision affecting employment" as required by the statute.

the employer's action has yet to prove to be one of discharge."[6] Viewing all reasonable inferences in plaintiff's favor, *Kubczak v Chemical Bank & Trust Co*, 456 Mich 653, 663; 575 NW2d 745 (1998), we conclude that the trial court erred in denying defendant's motion for a directed verdict with respect to plaintiff's theory of quid pro quo sexual harassment. Because there was no decision affecting plaintiff's employment, plaintiff's proofs were insufficient, as a matter of law, to put such a theory of liability at issue.

B

Finally, because the Court of Appeals erroneously failed to apply controlling Michigan legal principles regarding sexual harassment claims brought under Michigan law, and instead applied the federal principles announced in *Faragher* and *Ellerth*, it is necessary that we remand this case to the Court of Appeals for reconsideration of defendant's challenge to plaintiff's hostile environment claim under the proper legal framework.

Plaintiff's testimony clearly established the existence of a hostile work environment. The central question to be addressed on remand is whether plaintiff presented sufficient evidence to demonstrate that defendant "failed to rectify a problem after adequate notice." *Radtke, supra* at 395. That is, whether defendant failed to take prompt and appropriate remedial action after receiving adequate notice that Wolshon

---

[6] *Jacobson* involved a dispute over *when* the constructive discharge in that case took place. That issue is not presented here. Both the majority and dissent in *Jacobson* appear to have agreed that no constructive discharge has taken place if the employment was never terminated.

was sexually harassing plaintiff. As an additional word of clarification, we observed in *Radtke* that a reasonableness inquiry, accomplished by objectively examining the totality of the circumstances, is necessary to fulfill the purposes of the Michigan Civil Rights Act. *Id.* at 386-387. This also holds true for an inquiry into the adequacy of the notice. Therefore, notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring. See *Perry v Harris Chernin, Inc*, 126 F3d 1010, 1014 (CA 7, 1997) (the law against sexual harassment is not self-enforcing; although an employee has no duty under the law to report discriminating harassment, an employer cannot be expected to correct such harassment unless the employer has reason to know that it is occurring). Finally, we emphasize that the relevant inquiry concerning the adequacy of the employer's remedial action is whether the action reasonably served to prevent future harassment of the plaintiff.

## V. THE DISSENT

In our view, the dissent badly misstates our explanation of the distinctions that cause certain types of misconduct by employees to be attributable to an employer, while leaving employers free from liability for other types of employee misconduct. One initial flaw in the dissent's criticism is its implicit premise that our decision today relegates the misconduct at issue in this case to the lesser of two categories of sexual harassment. In reality, employers are *equally* prohibited from engaging in hostile environment sex-

ual harassment and quid pro quo sexual harassment; both of these types of harassment encompass a spectrum of misconduct from least to most egregious. To categorize a given pattern of misconduct as only of the type that possibly gives rise to a claim of hostile environment harassment does not mean that the misconduct is less egregious than other harassment. Rather, it simply allows this Court to determine whether the sexual harasser's *employer*, in addition to the sexual harasser *himself*, is to be held responsible for the misconduct.

The dissent asserts that the majority has added an element to what constitutes a prima facie case of quid pro quo sexual harassment because the dissent disputes that such a showing includes a decision regarding a "tangible employment action." This appears to be an argument supported only by semantics. A tangible employment action is simply "a decision affecting the individual's employment," which is an element of quid pro quo harassment that is explicitly required by the statute.[7] MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii). In *Champion*, we said that "quid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual

---

[7] "Tangible employment action" has become a term of art in cases involving sexual harassment, and is analogous to the term "adverse employment action" in employment discrimination cases based on disparate treatment, but it allows for the idea that, in sexual harassment cases, a decisionmaker could secure an employee's submission to unwelcome sexual advances by conditioning a beneficial (rather than adverse) change in an individual's employment status on that submission. See, e.g., *Ellerth* at 761 (explaining that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote," and comparing this to the holdings in a string of federal cases that stand for the proposition that, in disparate treatment cases, in order for an employment action to be adverse, it must be materially and objectively adverse).

favors or, alternatively, threaten job injury for a fail-ure to submit." *Id.* at 713. The dissent's attempt to dis-tinguish this passage from *Champion* by asserting that it merely defines those "individuals who have the ability to impose quid pro quo sexual harassment on employees," *post* at 329, n 2, is baseless inasmuch as it ignores *why* the ability to engage in such harass-ment is limited to persons with supervisory powers. The dissent would have us believe that quid pro quo harassment is limited to persons with supervisory power by happenstance or coincidence, rather than by the fact that a decision regarding a tangible employment action is an indispensable element of quid pro quo harassment, and only persons with supervisory powers could ever effectively make such a decision.

The dissent further argues that in *Champion*, quid pro quo sexual harassment was a *fait accompli* when the supervisor, on the basis of his victim's rejection of unwelcome sexual advances, decided to engage in conduct that we presumed amounted to a construc-tive discharge. From this, the dissent argues that our opinion is flawed because quid pro quo harassment is determined when the decision affecting employment is made and not when the effect of that decision is felt by the individual.[8] We do not decide whether an

---

[8] The dissent also argues that plaintiff *was* discharged, albeit several months later and ostensibly for unrelated reasons, and that because plain-tiff disputed the reasons given by defendant for that discharge, the ques-tion whether plaintiff suffered a tangible employment action should have been left to the jury. This requires us to again explain what should have already been clear. To show quid pro quo harassment, it is not enough to demonstrate harassment and a tangible employment action—there must be a causal relationship between the two. Plaintiff presented nothing to demonstrate that her eventual discharge was a consequence of her rejec-tion of, or submission to, Wolshon's harassment.

employee must be constructively or actively termi-
nated in order for an employer to be liable, nor do we
suggest that the employee's reaction to harassment is
the touchstone of quid pro quo harassment. Instead,
we disagree with the dissent's suggestion that every
sexual assault or molestation by a supervisor will
automatically amount to quid pro quo harassment.
*Champion* did not hold that all sexual assaults will
result in a constructive discharge. In fact, *Champion*
expressly stated that its holding was not intended to
"extend unlimited liability to employers whose super-
visors rape subordinates." *Id.* at 713. Rather, *Cham-
pion* made clear that an action leading to construc-
tive discharge, like an active discharge, *can* constitute
a decision affecting employment.

In *Champion*, the rape of the employee constituted
quid pro quo harassment because, when the decision
to rape was made in response to the employee's rejec-
tion of her supervisor's sexual advance, a construc-
tive discharge contemporaneously occurred. There,
the employer's "decision to use force, in other words,
was the equivalent of a decision to discharge because
Mr. Fountain should have expected that it would lead
to Ms. Champion's resignation." *Champion* at 711. It
was this "decision to discharge" that constituted a
decision affecting employment. In the present case,
there was no "decision to discharge." This case is
therefore, distinguishable from *Champion*. Yet, our
recognition that there was no decision to discharge
here is not equivalent to an assertion that the
employee loses the quid pro quo protections of the
CRA when the employee chooses to continue working.
It instead is a recognition that an employee who con-
tinues working must bear the burden of proving that
the employer nonetheless made a decision affecting

employment. We think the dissent misapprehends *Champion*'s holding by concluding that sexual harassment in the form of sexual assaults or molestation will *always* be quid pro quo harassment when committed by a supervisor. Some acts of harassment by a supervisor, though statutorily proscribed, fit more readily within the hostile environment protections of the CRA than the quid pro quo protections.

The dissent also argues that a supervisor's decision to engage in conduct that creates a hostile work environment can suffice as the decision that affects employment and thereby establish quid pro quo harassment—even when there is no other effect on employment other than the substantial interference with employment that qualifies the environment as hostile. However, the plain language of the statute requires that, in cases of quid pro quo harassment, an individual's "[s]ubmission to the conduct or communication [be] made a term or condition . . . to obtain employment" or that "[s]ubmission to or rejection of the conduct or communication by an individual [be] used as a factor in decisions affecting the individual's employment . . . ." MCL 37.2103(i)(i),    (ii); MSA 3.548(103)(i)(i), (ii). This language explicitly distinguishes between the decision to harass and the subsequent decision affecting employment that results from the victim's reaction to the harassment. Even if we contemplated Wolshon's pattern of behavior as a series of discrete incidents, there is no evidence suggesting that he engaged in one incident of misconduct on the basis of plaintiff's reaction to a previous incident. To the contrary, it is manifestly evident that Wolshon understood that his overtures were unwelcome and was indifferent to both plaintiff's rejection of them and the fact that, as he engaged in this con-

duct, he was interfering with her employment; this is the very essence of hostile environment sexual harassment.

Although we recognize that plaintiff might well continue to be affected in some way after defendant took steps to assure that she would no longer be subject to Wolshon's conduct, this does not support the conclusion that her *employment* would continue to be affected. By the dissent's reasoning, any unwelcome sexual contact to an employee by a person in a higher position would strictly subject the employer to liability for that contact, regardless of the fact that the employer could not have anticipated the incident, took every precaution to avoid such incidents, disciplined employees responsible for such incidents, and ensured afterward that the victim's employment was not altered by the incident. The dissent would have us rewrite the statute so as to make employers responsible for any decision occurring at work that affects an individual, rather than only for decisions affecting the individual's *employment.*

The dissent simply ignores the statutory definitions of sexual harassment and would simply label all harassment by individuals possessing supervisory authority as "quid pro quo" and all harassment by coemployees as "hostile work environment." This is an interesting proposition, but it lacks any basis in law. Rather, imposing liability on an employer is predicated on the application of agency principles to the categories of conduct described by the statute, and not on the basis of the dissent's supervisor/nonsupervisor distinction. It is clear that supervisors can engage in hostile environment sexual harassment. that is distinct from quid pro quo harassment.

Further, the dissent, reasoning that whether plaintiff actually knew of the policy was a significant issue to be resolved by the jury, makes much of the fact that plaintiff testified that she did not actually know of defendant's policy against sexual harassment. As much as anything else, this demonstrates that the dissent misses the point. Whether defendant can be held responsible for acts perpetrated by Wolshon turns on: (1) the nature of defendant's relationship with Wolshon; and (2) any failings on the part of defendant that contributed to Wolshon's success in harassing plaintiff. Hence, it would be relevant to demonstrate that plaintiff was unaware of defendant's policy because of an omission on the part of defendant. However, if defendant had done all that could reasonably be expected in order to make plaintiff aware of its policy, it matters little to the issue of vicarious liability if, for reasons not attributable to defendant, plaintiff was not actually aware of the policy. Hence, absent evidence attributing plaintiff's claimed lack of knowledge to a failing by defendant, the dissent's argument in this regard carries little weight. To the extent that the dissent's arguments are relevant, they pertain primarily to the sufficiency of the evidence issues to be considered on remand.

Finally, the dissent disagrees with our decision to remand this case to the Court of Appeals for reconsideration of plaintiff's hostile environment claim. The dissent perceives that it can glean all it needs to know from the earlier Court of Appeals opinion applying the principles announced in *Faragher* and *Ellerth*. Inasmuch as the Court of Appeals placed the burden of proving vicarious liability on the wrong party, we cannot confidently draw the same conclusion as the dissent.

CONCLUSION

In sum, we decline to engraft the principles stated in *Ellerth* and *Faragher* to actions for sexual harassment brought under the Michigan Civil Rights Act. Rather, we adhere to the specific statutory language of Michigan law and to prior Michigan precedent construing that language. We also find no basis in law, statutory or otherwise, for deviating from our past incorporation of traditional agency principles to actions brought under the Civil Rights Act or for having different burdens of proof in sexual harassment cases than in other cases alleging other forms of discrimination prohibited under the same act.

Further, we find that the evidence adduced at trial was insufficient, as a matter of law, to make out a claim for quid pro quo harassment because of the absence of any tangible employment action taken with respect to plaintiff. Finally, because the Court of Appeals erroneously failed to follow Michigan law when reviewing defendant's challenge to plaintiff's hostile environment claim, we vacate the judgment of the Court of Appeals and remand this case to that Court for reconsideration in light of this opinion. We do not retain jurisdiction.

WEAVER, C.J., and CAVANAGH, TAYLOR, CORRIGAN, and YOUNG, JJ., concurred with MARKMAN, J.

KELLY, J. (*dissenting*). I cannot join the majority's disposition of plaintiff's claim of quid pro quo sexual harassment. Plaintiff has established a prima facie case of such harassment, pursuant to the Michigan

Civil Rights Act (MCRA)[1] and *Champion v Nation Wide Security, Inc*, 450 Mich 702; 545 NW2d 596 (1996). But, the majority has misinterpreted *Champion* and added an element, one not found in the MCRA.

### I. THE PRIMA FACIE REQUIREMENTS FOR QUID PRO QUO SEXUAL HARASSMENT CLAIMS

The MCRA specifically includes sexual harassment as a form of discrimination because of sex. MCL 37.2103(i); MSA 3.548(103)(i). "Sexual harassment" is defined as:

> (i) . . . unwelcome sexual advances, requests for sexual favors, and other verbal or physical contact or communication of a sexual nature under the following conditions:
>
> (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.
>
> (ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.
>
> (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

MCL 37.2103(i)(i) and (ii); MSA 3.548(103)(i)(i) and (ii) present two separate theories under which a party may make out a claim for quid pro quo sexual harassment. *Champion, supra* at 708. In *Champion*, we

---

[1] MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*

summarized the elements that a plaintiff must establish under MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii):

> (1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment. See also *Kauffman v Allied Signal, Inc*, 970 F2d 178 (CA 6, 1992). [*Champion, supra* at 708-709.]

*Champion* also adopted the nearly unanimous view that imposes close to strict liability for such harassment committed by supervisory personnel. *Id.* at 712. This rule is based on the responsibility of an employer to remedy the harm caused by a supervisor's unlawful exercise of authority delegated by the employer. *Id.*

### II. PLAINTIFF HAS ESTABLISHED THE ELEMENTS FOR A PRIMA FACIE CLAIM OF QUID PRO QUO SEXUAL HARASSMENT

The majority determines that the trial court erred in denying defendant's motion for a directed verdict on plaintiff's claim. According to the majority, in order to establish such a claim, plaintiff must show the existence of a tangible employment action. *Ante,* p 317.

Neither MCL 37.2103(i)(ii);  MSA 3.548(103)(i)(ii) nor *Champion* requires plaintiff to prove a tangible employment action[2] in order to proceed with a claim

---

[2] *Champion* refers to tangible job benefits or injuries only in terms of defining individuals who have the ability to impose quid pro quo sexual harassment on employees:

> [T]he party engaged in quid pro quo harassment is almost always, by definition, a supervisor. That is, quid pro quo harass-

of quid pro quo sexual harassment. They require only a showing that the plaintiff's submission or rejection was "a factor in decisions affecting [her] employment." MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii). *Champion, supra* at 708-709.

In *Champion,* we recognized that a supervisor has authority to make decisions affecting an individual's employment:

> It is this Court's opinion that Mr. Fountain's [Ms. Champion's supervisor] decision to rape Ms. Champion constituted the requisite "decision affecting . . . employment." In addition, this was a decision taken in response to Ms. Champion's refusal to voluntarily submit to Mr. Fountain's sexual requests. [*Id.* at 709-710.]

Thus, pursuant to *Champion,* the proper point of focus is the supervisor's conduct, not plaintiff's or defendant's actions after the incident:

> The decision to use force, in other words, was the equivalent of a decision to discharge because Mr. Fountain should have expected that it would lead to Ms. Champion's resignation. This "decision affecting . . . employment" is actionable under MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii) because Ms. Champion's refusal to comply with Mr. Fountain's requests for sexual favors led to his decision to use force. [*Id.* at 711.]

Because the majority determines that there was no constructive discharge in this case, it concludes that plaintiff did not suffer a tangible employment action.[3]

---

ment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit. That individual is most often a person with supervisory powers. [*Id.* at 713.]

[3] Even if a tangible employment action were a necessary element in quid pro quo sexual harassment claims, Mrs. Chambers presented suffi-

But, a claim of quid pro quo sexual harassment under the facts of this case is not precluded:

> As previously noted, *even without the discharge,* the decision to rape was, in all respects, "a decision affecting [Ms. Champion's] employment" taken in response to her refusal to submit to Mr. Fountain's sexual requests. It can hardly be disputed that, even if Ms. Champion had returned to work, the rape would have "affected" her employment in some way. [*Champion, supra* at 711, n 5 (emphasis added).]

---

cient evidence of quid pro quo sexual harassment. At trial, she argued that she did suffer an employment consequence. She was a temporary employee and was sent to different locations throughout her employment with defendant. Defendant testified that Mrs. Chambers was terminated on September 11, 1995, after failing to appear for work. Mrs. Chambers testified that the regional manager's assistant told her to go home and that, when the company had a new assignment for her, someone would telephone her. According to Mrs. Chambers, no one called her and no one returned her calls when she attempted to find out where her next assignment would be.

The majority does not credit this evidence because Mrs. Chambers dismissed her retaliatory discharge claim. But the majority presents no authority that, when a plaintiff declines to pursue one claim, this Court may disregard evidence that also supports another. Here, whether plaintiff suffered an adverse employment action. Merely because Mrs. Chambers, perhaps as a matter of trial strategy, chose not to pursue her retaliatory discharge claim does not mean she did not suffer an adverse employment action.

At trial, the jury was asked to answer two specific interrogatories: 1) whether Paul Wolshon sexually assaulted or molested Robyn Chambers through the use of his supervisory powers over her, and 2) whether defendant failed to take prompt remedial action after it knew or should have known that she had been sexually harassed. The jury answered both questions in the affirmative.

Given the specific verdict rendered, there is no way to tell whether the jury credited defendant's version of why Mrs. Chambers was fired or her version. Thus, even if I agreed with the majority's legal analysis, the procedural history prevents me from concluding that it was error to deny defendant's motion for directed verdict. If it disagrees with how the trial judge legally analyzed *Champion,* the majority should remand this case for a new trial, not decide credibility and factual issues for itself.

Thus, *Champion* recognizes that the decision to rape a subordinate *is* the decision affecting employment. A victim's response to the decision affecting employment is irrelevant. *Champion*'s holding would not have been different if Ms. Champion continued to work for defendant after her supervisor raped her.

The majority insists that an employee who quits is in a different position than one who continues to work after her supervisor makes a decision affecting her employment. In so doing, the majority draws an arbitrary distinction between rape and a week of sexual intimidation and humiliation. It appears to be straining to avoid applying the rule we enunciated in *Champion* to the facts of this case.

A correct application of *Champion* requires the conclusion that Mr. Wolshon's decision to make sexual contact with Mrs. Chambers without her consent was, in and of itself, a decision affecting her employment. By focusing on Mrs. Chambers' actions after her employment had been adversely affected, the majority misapplies *Champion*.

In *Champion*, the defendant tried to argue that it had not given its supervisor authority to rape a subordinate. We rejected the argument, noting that

[t]his construction of agency principles is far too narrow. It fails to recognize that when an employer gives its supervisors certain authority over other employees, it must also accept responsibility to remedy the harm caused by the supervisors' unlawful exercise of that authority. *Henson v City of Dundee*, 682 F2d 897, 909 (CA 11, 1982). From his scheduling decisions that allowed him to work alone with Ms. Champion to his ordering of her into a remote part of the building, Mr. Fountain used his supervisory power to put Ms. Champion in the vulnerable position that led to her rape. In fact, there is little doubt that Mr. Fountain would

have been unable to rape Ms. Champion but for his exercise of supervisory authority. [*Id.* at 712.]

Similarly, in this case, Mr. Wolshon used his authority as a supervisor to linger in Mrs. Chambers' work area.[4] Because Mr. Wolshon was their supervisor, Mrs. Chambers and her co-worker felt that they could not speak freely about his abusive behavior.

I agree with the majority when it characterizes an employer's liability as hinging on "whether it can be fairly said that the employer committed the violation—either directly or through an agent." *Ante,* p 312. By giving Mr. Wolshon the authority he used to assault Mrs. Chambers, defendant committed the violation through its agent. This is consistent with our holding in *Champion*:

> Our ruling today does not extend unlimited liability to employers whose supervisors rape subordinates. However, we hold an employer strictly liable where the supervisor accomplishes the rape through the exercise of his supervisory power over the victim. The rule we fashion is fully consistent with the results reached by other courts addressing this issue and with the legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination. [*Champion, supra* at 713-714.]

The flaw in the majority's overall treatment of this case is that, in analyzing whether Mr. Wolshon's con-

---

[4] As Mrs. Chambers' supervisor, Mr. Wolshon could and did spend his time in the area where Mrs. Chambers worked, instead of remaining in the office as did Mrs. Chambers' regular supervisor, Jennifer Hostutler. Defendant's regional manager, Kevin McLaughlin, informed Mrs. Chambers and her two co-workers that Mr. Wolshon was "in charge" while Ms. Hostutler was on vacation. There was no one in a higher position at the location where Mrs. Chambers worked who was authorized to curb Mr. Wolshon's conduct.

duct was quid pro quo sexual harassment, it focuses on plaintiff's reaction. As we pointed out in *Champion*, this is incorrect, because it blames the victim. *Id.* at 711.

Instead, the analysis should concentrate on what defendant and its agent did. This focus would comport "with the legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination." *Id.* at 714.

Here, defendant gave Mr. Wolshon supervisory authority over plaintiff. Mr. Wolshon, acting as defendant's agent, then used that authority to lewdly proposition and sexually assault Mrs. Chambers for four days.

Had Mr. Wolshon not been the supervisor, he would not have been able to continue this pattern of behavior. Someone having authority over him would have stopped it after the first instance.[5] Instead, matters escalated to the point where, on the third and fourth day that Mr. Wolshon harassed her, Mrs. Chambers actually slapped him. In response, Mr. Wolshon merely laughed.

Because of his position with defendant, Mr. Wolshon was able to sexually intimidate and humiliate Mrs. Chambers repeatedly. Her attempts to alert the regional manager were unavailing. She did not realize

---

[5] Mrs. Chambers described the first incident as follows:

> Well, it was the very first day and I was by the freezer, and he walked in and he rubbed my rear end.

Mrs. Chambers' attorney asked her if she said anything in response. She replied that she said, "Excuse me." According to Mrs. Chambers' testimony, Mr. Wolshon then replied, "Oh, I'm sorry."

this until her week of abuse was over.[6] In inflicting this sexual humiliation, Mr. Wolshon made a decision affecting her employment. He decided to treat her in such a way that her only choice was to submit to the assault or not come to work at all.[7]

Mr. Wolshon could force Mrs. Chambers into this dilemma only because he was the supervisor.[8] Had it been only a co-worker treating her this way, Mrs. Chambers could have simply brought the problem to the supervisor on site. When she tried to complain to Mr. Wolshon's supervisor, Mr. McLaughlin, Mr. Wolshon could and did effectively prevent it.

There is a critical difference between quid pro quo and hostile work environment sexual harassment claims. In quid pro quo claims, the victim's employment must be adversely affected in some manner.

---

[6] On the second day that Mr. Wolshon was her supervisor, Mrs. Chambers alerted the regional manager that something was wrong. She was not more explicit in what she said because Mr. Wolshon was standing within earshot.

Mrs. Chambers had been an employee only one week when these events occurred. She testified that, at that point, she knew only Jennifer Hostutler, who was the supervisor Mr. Wolshon temporarily replaced, and Kevin McLaughlin, the regional manager. A card in the office showed where she could obtain Mr. McLaughlin's telephone numbers, but that office was locked when the supervisor was not in it. Moreover, Mrs. Chambers relied on Mr. McLaughlin's promise that he was going to come to the work site and talk to her. The jury could have reasonably inferred that she believed she had done what she could to stop the harassment she was experiencing.

[7] During the week that Mr. Wolshon was her supervisor, Mrs. Chambers told co-workers she wanted to quit. She did not quit, because her employer promised not to leave her alone with Mr. Wolshon.

[8] Mrs. Chambers testified that she felt that this situation differed from others when she had been subjected to sexual comments because the intimidator, here, was her supervisor. She also testified that, because Mr. Wolshon was a supervisor, he could go anywhere he wanted in the facility. The week Mr. Wolshon was Mrs. Chambers' supervisor, he spent most of his time in her work area.

In hostile work environment claims, it need not be affected. I disagree with the majority's assertion that the effect on employment must be "tangible." It can be, as it was here, tacit. Because he was the supervisor, and she the subordinate, Mr. Wolshon could sexually threaten and humiliate Mrs. Chambers; all she reasonably could have done to avoid the degrading behavior was to quit.

In deciding to treat her in this manner, Mr. Wolshon made submitting to his sexual misconduct a term of Mrs. Chambers' employment. He could do this only because defendant gave him supervisory authority over her.

Thus, quid pro quo sexual harassment occurs when the employer's agent misuses his supervisory authority in a way that affects a subordinate's employment. In hostile work environment claims, the harasser does not affect the victim's employment. Either, he does not have the authority to do so, or he does not accomplish the harassment through the use of supervisory authority over the victim.

To require plaintiffs to prove that they suffered a tangible employment action is to introduce an element that cannot be derived from the statutory language of MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii). It is also an element that may foreclose relief in situations where, as here, there clearly has been sexual discrimination. Another instance would arise if a woman's supervisor *threatened* to jeopardize her job unless she submitted to his sexual advances. If she submitted, she would be further sexually harassed, although suffering no tangible employment action. Under the majority's analysis, the employer would not be held vicariously liable, because its agent did not make a decision affecting her employment.

The majority creates a loophole in the sexual harassment provisions of the MCRA. It will allow an employer to sexually harass an employee without adverse legal consequences if the employee chooses to submit, rather than risk potential job injury. It also places the burden on employees to complain about their supervisor's sexually harassing conduct, rather than encouraging employers to take the initiative to prevent such occurrences.

### III. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

I disagree with the decision to remand this case to the Court of Appeals for consideration of plaintiff's claim of hostile work environment sexual harassment. Specifically, the majority instructs the Court of Appeals to consider "whether plaintiff presented sufficient evidence to demonstrate that defendant 'failed to rectify a problem after adequate notice.' " *Ante*, pp 318-319.

Although the Court of Appeals majority analyzed whether *Burlington Industries, Inc v Ellerth*,[9] and *Faragher v Boca Raton*,[10] should be adopted, it also observed that "the jury specifically found that defendant failed to take prompt remedial action after it knew or should have known that plaintiff had been sexually harassed, a finding that is supported by the evidence presented at trial."[11] The jury was instructed under *Champion* and *Radtke v Everett*, 442 Mich 368; 501 NW2d 155 (1993). The Court of Appeals has already concluded that there is sufficient evidence for

---

[9] 524 US 742; 118 S Ct 2257; 141 L Ed 2d 633 (1998).

[10] 524 US 775; 118 S Ct 2275; 141 L Ed 2d 662 (1998).

[11] 232 Mich App 560, 568-569; 591 NW2d 413 (1998).

the jury's finding that defendant knew or should have known that plaintiff had been sexually harassed.

### IV. THE EVIDENCE PRESENTED IN THIS CASE

I feel compelled to point out that the majority seems to assume that Mrs. Chambers knew of defendant's sexual harassment policy and the procedures outlined thereunder. *Ante*, p 305. However, at trial, the evidence presented to the jury suggests that the policy was never communicated to her.

Mrs. Chambers was hired on June 27, 1995. Mr. Wolshon was her supervisor and sexually harassed her between July 5 and 8. At trial, defendant's regional manager explained in detail the company's sexual harassment policy. He also testified that new hires are supposed to sign an acknowledgment form contained in an employee handbook distributed to them. The handbook contains defendant's sexual harassment policy. According to Mr. McLaughlin, "[a]n employee will not be paid unless that acknowledgment sheet is received in our office."

But, defendant offered no tangible evidence showing that Mrs. Chambers actually received and signed the handbook. She testified that she did not receive the handbook and that she was not aware of defendant's sexual harassment policy.

According to Mr. McLaughlin, defendant should have had in its records a form signed by Mrs. Chambers. A signed form indicating that Mrs. Chambers received and read defendant's sexual harassment policy was never produced at trial.

The majority attempts to cast responsibility on plaintiff for the fact that she was not actually aware of defendant's sexual harassment policy. According to

the majority, "it matters little to the issue of vicarious liability if, for reasons not attributable to defendant, plaintiff was not actually aware of the policy." *Ante,* p 325.

In taking this position, the majority usurps the role of the jury by deciding that defendant did communicate the policy to plaintiff. The evidence presented permitted the jury to infer that defendant never communicated the policy to plaintiff. If the jury did so infer, the fact that defendant had a sexual harassment policy becomes irrelevant. Of what value is a sexual harassment policy if the employer fails to ensure its employees are actually aware of it? The majority seems to suggest that employees have a duty to discover employers' policies when they begin working.

The majority also impermissibly credits defendant's version of why Mrs. Chambers was fired, as opposed to her version. *Ante,* p 306 ("Plaintiff was eventually discharged in September 1995 when she failed to show up for work for several consecutive days"). Mrs. Chambers testified that she was told to go home and wait for a telephone call informing her where her next assignment would be. It is the function of the jury to decide whose testimony to believe, not the function of the Court.

Throughout this case, the majority decides facts and makes inferences favoring the defendant. The jury, however, found in favor of the plaintiff. In determining whether the trial court should have granted a directed verdict in favor of the defendant, this Court is supposed to view all reasonable inferences in the plaintiff's favor. *Kubczak v Chemical Bank & Trust Co,* 456 Mich 653, 663; 575 NW2d 745 (1998). The majority fails to do so.

This case illustrates why we should proceed with great reluctance when asked to disturb a jury's findings of fact. In concluding that defendant failed to take prompt remedial action once it knew that Mrs. Chambers had been sexually harassed, the jury may have credited Mrs. Chambers' testimony over defendant's. We cannot know what factors the jury took into account when returning a verdict in plaintiff's favor.

## V. CONCLUSION

Neither the MCRA nor case precedent requires a plaintiff alleging quid pro quo sexual harassment to prove she suffered a tangible employment action. The statute requires only that she show that a decision was made adversely affecting her employment. In *Champion*, we held that, when a supervisor uses authority given by an employer to rape a subordinate, he makes a decision affecting that subordinate's employment. The decision is imputed to the employer because it is the employer that gives the supervisor the authority to make the decision.

The majority cannot successfully distinguish this case from *Champion*. Instead of straining to avoid the rule we pronounced there, I would simply apply it to this case.

I do not propose a rule imposing automatic liability on employers whenever a supervisor sexually assaults a subordinate. *Champion* itself did not impose such a rule. But, *Champion* did indicate there is a line which, if crossed, results in an automatic imputation to the employer of a supervisor's sexual misconduct, if performed in his capacity as a supervisor. Clearly, the rape of Ms. Champion crossed the line.

Mr. Wolshon's behavior, also, crossed it. By finding that it did not, the majority draws an arbitrary distinction between rape and a week of unwelcome sexual contact.

This case cannot be distinguished from *Champion*, either, merely because Mrs. Chambers did not quit after her supervisor sexually harassed her. The majority treats employees who continue to work after being sexually harassed by a supervisor differently from those who quit. In so doing, it misinterprets *Champion*.

*Champion* makes it clear that it is not the victim's conduct, but the supervisor's conduct, that is scrutinized. The majority's holding shifts responsibility for a decision made by its agent from the employer to the victim. If the victim does not respond as the majority today deems appropriate, she loses her claim of quid pro quo sexual harassment. This position clearly subjects victims of sexual harassment to burdens not contemplated by either *Champion* or the MCRA.

I cannot agree, either, with the majority's decision to establish a new element for quid pro quo sexual harassment claims. By doing so, the majority has altered the holding in *Champion*.

Finally, it is inappropriate to remand this case to the Court of Appeals to assess the sufficiency of the evidence presented regarding whether defendant had adequate notice of hostile work environment sexual harassment. The jury and the Court of Appeals determined that the evidence was sufficient. Consequently, I would affirm both the jury's verdict in favor of plaintiff and the Court of Appeals decision.