# STATE OF MICHIGAN

# COURT OF APPEALS

DARRELL WATZ and KAY WATZ,

       Plaintiffs-Appellees,

v

WAL-MART STORES EAST, LP, d/b/a WAL-MART SUPERCENTER, and THERESA LEDBETTER,

       Defendants-Appellant,

and

DEBBIE BORST,

       Defendant.

UNPUBLISHED
May 14, 2015

No. 320883
Macomb Circuit Court
LC No. 2012-000385-CD

Before: TALBOT, C.J., and CAVANAGH and METER, JJ.

PER CURIAM.

Defendants Wal-Mart Stores East, LP, d/b/a Wal-Mart Supercenter (Walmart), and Theresa Ledbetter appeal by leaved granted an order denying their motion for summary disposition in this employment-dispute case. We reverse and remand for entry of judgment in favor of defendants.

Plaintiff Darrell Watz[1] began working for Walmart in 1999. In 2007, plaintiff transferred to Walmart's store 3487 in Shelby Township. Since 2009, plaintiff has worked as an assistant manager at store 3487, where defendant Debbie Borst works as the store manager. Defendant Theresa Ledbetter worked as a shift manager at store 3487 and was plaintiff's supervisor from February 3, 2011, until February 11, 2012, when she was transferred to another store.

---

[1] Because plaintiff Kay Watz's claim is derivative of Darrell Watz's, this opinion's use of the term "plaintiff" refers to Darrell Watz only.

Plaintiff has had cerebral palsy since birth. It affects his coordination, ability to write legibly, speech patterns, and gait. He filed this lawsuit against Walmart, Ledbetter, and Borst alleging intentional infliction of emotional distress (IIED) and a hostile work environment based on disability harassment contrary to the Persons With Disabilities Civil Rights Act, MCL 37.1101 *et seq.* Plaintiff has since withdrawn his claims against Borst. This appeal concerns plaintiff's claims against Ledbetter and against Walmart on a respondeat superior theory.[2] Plaintiff alleged that, because of his disability, Ledbetter yelled at him and badgered him, refused to give him earned days off, prevented him from performing his job, and removed personnel from his department.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10), arguing, in part, that Ledbetter's conduct and communications directed toward plaintiff were not based on his disability. They also argued that Walmart immediately investigated the alleged harassment after plaintiff notified Walmart of his allegations. They further argued that plaintiff's IIED claim was not actionable because the exclusive remedy provision (see MCL 418.131) of the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*, barred the claim and because Ledbetter's conduct was not sufficiently extreme or outrageous to support the claim.

The documentary evidence shows that plaintiff had performance problems at work. The problems included failing to plan for and execute daily tasks, special events, retail displays, and promotions, failing to review internal emails that explained events and promotions, failing to delegate tasks, failing to understand Walmart programs, failing to train subordinates, and failing to respond to associate questions. Plaintiff received several "coachings," which are written statements describing his performance, what was expected of him, and his action plan to prevent the problem from recurring. The coachings involved failing to lock an ammunition safe after helping a customer, failing to plan for the midnight release of the video game "Call of Duty Modern Warfare," and failing to remove expired produce from shelves.

The evidence also showed that Ledbetter frequently yelled at plaintiff or talked to him inappropriately, sometimes in the presence of customers and associates or by using a walkie-talkie. She told plaintiff that he did a dumb or stupid thing when she disagreed with his approach to a workplace issue or when he had made a mistake. Plaintiff also testified that Ledbetter transferred employees out of plaintiff's department, which made it more difficult for him to complete his work, that she gave him inconsistent assignments, that she ignored him, that she interfered with his hiring and scheduling processes, and that she micromanaged his work. Further, plaintiff claimed that on one occasion, Borst and Ledbetter brought him to the manager's office and told him that someone had reported that he smelled like urine. They allegedly told him to get new clothes or cologne to cover up the smell.

According to Borst, she received complaints regarding Ledbetter's general management style from employees other than plaintiff. Borst issued two written coachings to Ledbetter for her failure to show consistent respect to members of management. Both coachings involved

---

[2] Because plaintiff dismissed his claims against Borst, this opinion's use of the term "defendants" refers to Walmart and Ledbetter only.

Ledbetter's tone of voice in dealing with members of management. Sheryl Anderson testified that Ledbetter treated employees other than plaintiff, including Anderson, in a manner similar to the way she treated plaintiff, but she also stated that "[Ledbetter] was harder on [plaintiff]. She was always on his case." Monica Mikkelson testified that Ledbetter yelled at employees other than plaintiff, that Ledbetter had a direct and demanding management style, and that Ledbetter angered easily and was abrasive and blunt. Mikkelson also testified that Ledbetter treated other associates consistent with the manner in which she treated plaintiff. Marie Dell testified that employees other than plaintiff complained about Ledbetter. She claimed that "[t]he midnight shift complained a lot about [Ledbetter]. They had some big issues with her."

In the summer of 2011, Mary Romska and other zone merchandise supervisors had a meeting with Jim Pesta, a Walmart human resources manager, regarding Ledbetter's treatment of associates, in particular a woman named "Mandy" and plaintiff. Romska testified that the subject of plaintiff's cerebral palsy was not mentioned at the meeting. According to Pesta, the zone merchandise supervisors complained about the manner in which Ledbetter treated associates in general and did not indicate that Ledbetter treated plaintiff worse than other associates. Pesta also averred that nobody mentioned plaintiff's disability during the meeting and nobody indicated that Ledbetter was being disrespectful toward plaintiff because of his disability. Pesta investigated the complaint by listening to how Ledbetter talked to employees on her walkie-talkie. He observed that she assumed a disrespectful tone with most of the assistant managers, but averred that nothing indicated that she treated plaintiff differently than most other assistant managers. Pesta's investigation prompted Borst's second coaching to Ledbetter.

On November 25, 2011, plaintiff's lawyer sent a letter to Walmart's office of general counsel stating that plaintiff was being harassed because of his disability. Pesta investigated the matter. Pesta averred that before plaintiff's attorney sent the letter, nobody had told him that Ledbetter singled plaintiff out for mistreatment or treated him worse than other employees. Pesta investigated the matter by interviewing plaintiff, Ledbetter, Borst, and Romska. Pesta concluded that plaintiff's allegations of disability harassment were not substantiated, but Ledbetter was nonetheless transferred to a different store in part to address plaintiff's and other associates' complaints about her management style.

The trial court denied defendants' motion for summary disposition. The court determined that plaintiff had presented evidence from which a jury could conclude that he was treated disparately and that the treatment he received created an intimidating, hostile, and offensive work environment. The court determined that Walmart had notice of Ledbetter's treatment of plaintiff in the summer of 2011 when the zone merchandise supervisors met with Pesta to complain about Ledbetter's treatment of employees. Further, the court determined that reasonable minds could differ regarding whether Ledbetter's treatment of plaintiff was sufficiently extreme to support his IIED claim.

This Court reviews de novo a trial court's decision concerning a motion for summary disposition under MCR 2.116(C)(10). *Lakeview Commons v Empower Yourself, LLC*, 290 Mich App 503, 506; 802 NW2d 712 (2010). "A motion brought pursuant to MCR 2.116(C)(10) tests the factual support of a plaintiff's claim, and is reviewed by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Id*. "Summary disposition is proper if there is no genuine issue regarding

any material fact and the moving party is entitled to judgment as a matter of law." *Id*. (quotation marks and citation omitted).

Defendants argue that plaintiff cannot establish that Ledbetter's conduct or communications were based on his disability.

"[A] hostile work environment claim is actionable when the work environment is so tainted that, in the totality of the circumstances, a reasonable person in the plaintiff's position would have perceived the conduct at issue as substantially interfering with employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke v Everett*, 442 Mich 368, 372; 501 NW2d 155 (1993).

> In order to establish a prima facie case of hostile work environment, a plaintiff must prove: (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. [*Downey v Charlevoix Co Bd of Rd Comm'rs*, 227 Mich App 621, 629; 576 NW2d 712 (1998).]

In *Corley v Detroit Bd of Ed*, 470 Mich 274, 279-280; 681 NW2d 342 (2004), the Michigan Supreme Court recognized that in order to establish a hostile work environment claim based on sexual harassment, the conduct or communications complained of must have been sexual in nature. Thus, by analogy, in order for plaintiff to establish a hostile work environment claim based on his disability, he was required to present evidence that the conduct and communications on which he relied to establish his claim pertained to his disability.

The evidence showed that Ledbetter had a difficult management style and had received coachings regarding her management style because employees other than plaintiff had complained about her. Employees Anderson and Mikkelson testified that Ledbetter treated other employees in a manner consistent with the way she treated plaintiff. Anderson also testified that "[Ledbetter] was harder on [plaintiff]. She was always on his case." No evidence, however, indicated that Ledbetter's treatment of plaintiff was *based on his disability*. In this regard, plaintiff testified:

> *Q*. Okay. Do you have any reason to believe that her calling you dumb was motivated by something other than being angry that you made a mistake?

> *A*. I believe she had it in her mind that I was worthless because of the handicap.

> *Q*. Did she say or do anything that made you believe that?

> *A*. She never said anything, except the way she treated me.

-4-

* * *

*Q.* Do you have any reason to believe that [Ledbetter's] outburst towards you was motivated by something other than being angry about your mistakes?

[*PLAINTIFF'S COUNSEL*]: Objection. That's asked and answered a whole bunch of times. Come on. Please go into a new question.

*A.* Yeah. I said she—I believe she was motivated by the handicap. I believe that. How many times do I have to tell you?

* * *

*Q.* Did Ms. Ledbetter ever say anything to you that you believe was a derogatory statement towards your handicap?

*A.* I thought I told you that. No.

*Q.* I'm sorry. What?

*A.* I thought I said two or three times no.

* * *

*Q.* Is it possible that [Ledbetter] was micromanaging you because you were making mistakes at work?

*A.* Okay. If she was, if that is the case, it still don't give her the right to talk to me the way she did and treated me the way she did.

*Q.* But do you agree that in terms of micromanaging, that she maybe was being overly controlling of your work because you were making mistakes; is that possible?

*A.* That's possible, yeah. Anything is possible.

At another point in his deposition, plaintiff stated "[n]o" when asked if he had "any basis for [his] belief that [Ledbetter] was motivated by [his] handicap." Thus, although plaintiff may have *subjectively believed* that Ledbetter's poor treatment of him was based on his disability, the documentary evidence provides no basis for a substantiation of that belief. See *Marsh v Dep't of Civil Service*, 173 Mich App 72, 81; 433 NW2d 820 (1988) (a plaintiff's personal belief that actions were based on discrimination is insufficient to establish discrimination).

Plaintiff contends on appeal that his being called "dumb" and "stupid" was evidence of discrimination when viewed in light of the fact that he has cerebral palsy. We cannot agree with

this inference when plaintiff himself does not allege that he has a cognitive disability.[3] The words, while inappropriate, fit in with Ledbetter's generally abrasive management style. Plaintiff also contends that his testimony that Ledbetter failed to acknowledge him when he began to speak to her was also evidence of discrimination. We fail to see how this alleged treatment established disability-based discrimination. Finally, plaintiff contends that the fact that Ledbetter treated him worse than other employees was evidence of discrimination. However, plaintiff himself acknowledged that his poor treatment by Ledbetter may have been a result of his work mistakes; there is simply no evidence indicating that the treatment was related to plaintiff's disability.

Defendants also argue that Walmart took prompt remedial action when it learned of possible harassment. In order to establish a respondeat superior hostile work environment claim against an employer, a plaintiff must show that the employer failed to take prompt and adequate remedial action after having been provided reasonable notice of the harassment, even if the harassment was committed by a supervisor. *Chambers v Trettco, Inc*, 463 Mich 297, 315-316; 614 NW2d 910 (2000). An employer has notice of harassment where, under an objective standard, the totality of the circumstances indicate that a reasonable employer would have been aware of the probability that the harassment was occurring. *Id*. at 319. "[T]he relevant inquiry concerning the adequacy of the employer's remedial action is whether the action reasonably served to prevent future harassment of the plaintiff." *Id*.

To establish that Walmart had notice of Ledbetter's treatment of plaintiff, plaintiff relies on the meeting that Mary Romska and other zone merchandise supervisors had with Jim Pesta in the summer of 2011. As noted above, however, the evidence regarding this meeting failed to show that plaintiff's disability was a factor in Ledbetter's conduct. Pesta averred that plaintiff's disability was not discussed during the meeting and nobody indicated that Ledbetter had been disrespectful toward plaintiff because of his disability. He investigated the matter and determined that Ledbetter often assumed a disrespectful tone but did not treat plaintiff differently than most other assistant managers.

The zone merchandise supervisors' general complaint about Ledbetter's treatment of plaintiff and "Mandy" did not provide Walmart with actual or constructive notice that Ledbetter had purportedly harassed plaintiff on the basis of his disability.[4] As noted, on November 25, 2011, plaintiff's lawyer sent a letter to Walmart's office of general counsel stating that plaintiff was being harassed because of his disability. Pesta investigated the matter, and even though he concluded that plaintiff's allegations of disability harassment were not substantiated, Ledbetter was nonetheless transferred to a different store approximately a month after the completion of the investigation. We find no respondeat superior liability under these circumstances.

---

[3] Plaintiff states that he "has extreme trouble verbally communicating his thoughts and is very difficult to understand," but he does not allege cognitive deficits.

[4] Nor, contrary to plaintiff's suggestion, did the "pervasive" facts in this case provide constructive notice of disability-based harassment.

Defendants next argue that the IIED claim must be dismissed. We note, initially, that plaintiff withdrew his claim of IIED against Walmart but contends that the claim is viable against Ledbetter. We disagree. MCL 418.131, the exclusive remedy provision of the WDCA, provides, in relevant part:

> (1) The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort. An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge. The issue of whether an act was an intentional tort shall be a question of law for the court.

It cannot be seriously argued that Ledbetter "specifically intended an injury" and "had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." Plaintiff implicitly suggests that the language of MCL 418.131 is inapplicable in his individual claim against Ledbetter (as opposed to the dismissed claim against Walmart). However, even if we disregard the specific statutory language in MCL 418.131, plaintiff has not shown conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 603; 374 NW2d 905 (1985) (quotation marks and citation omitted).

Reversed and remanded for entry of judgment in favor of defendants. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Mark J. Cavanagh
/s/ Patrick M. Meter