# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

*In re* MALLOY GUARDIANSHIP
*In re* JENKINS GUARDIANSHIP

Docket Nos. 165018 and 165020. Argued on application for leave to appeal December 7, 2023. Decided May 28, 2024.

Darren Findling, an attorney and professional guardian, and the Darren Findling Law Firm, PLC, brought two separate actions in the Oakland County Probate Court against Auto-Owners Insurance Company, seeking reimbursement for guardianship services performed for Mary Ann Malloy and Dana Jenkins by employees of the law firm. In 2019, Findling was appointed to serve as guardian for Jenkins and as coguardian for Malloy, both of whom suffered serious injuries in automobile crashes that rendered them legally incapacitated. Both Jenkins and Malloy received no-fault benefits from Auto-Owners.

In 2019 and 2020, Findling, along with employees of his law firm, provided various guardianship services to Malloy and Jenkins, including guardian visits and meetings with physicians, case managers, the Social Security Administration, and their banks. Findling sought reimbursement from Auto-Owners for these and other services under MCL 500.3107(1)(a) of the no-fault act, MCL 500.3101 *et seq*. Auto-Owners declined to reimburse for the services that were performed by the employees of Findling's law firm, raising as affirmative defenses that the care and services provided were not lawfully rendered. In both cases, Findling moved for partial summary disposition solely on the issue whether Auto-Owners was required to reimburse for guardianship services performed by employees of his law firm, and Auto-Owners filed countermotions for summary disposition on the same issue. Auto-Owners argued that it was not required to reimburse for such services because Findling had not complied with MCL 700.5103 of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*., which restricts the delegation of guardianship "powers" to fewer than 180 days and requires a valid power of attorney and notice to the court. Findling countered that he only delegated his guardianship duties—but not his powers—to employees of his law firm and therefore was not required to comply with MCL 700.5103. He further argued that he was legally permitted to have employees perform guardianship duties under MCL 700.5106(5) and (6).

The probate court, Daniel A. O'Brien, J., heard oral argument in both cases together and granted Findling's motions for partial summary disposition. Auto-Owners filed interlocutory applications for leave to appeal in both cases, which the Court of Appeals originally denied.

Auto-Owners sought leave to appeal in the Supreme Court, and the Supreme Court remanded both cases to the Court of Appeals for consideration as on leave granted. 509 Mich 880 (2022). On remand, the Court of Appeals, SWARTZLE, P.J., and CAVANAGH and REDFORD, JJ., consolidated the two appeals and affirmed in part and reversed in part, holding that a guardian is only required to comply with MCL 700.5103 to lawfully delegate guardianship powers, which it defined as tasks that alter the rights, duties, liabilities, or other legal relations of an incapacitated individual. 343 Mich App 548 (2022). Under this framework, the Court of Appeals concluded that there was no question of fact that Findling largely delegated guardianship duties—but not powers—to his employees. However, the Court of Appeals held that there remained questions of fact as to whether Findling unlawfully delegated his powers by allowing employees to prepare for and attend hearings regarding the modification of Malloy's and Jenkins's guardianships. Auto-Owners again sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on the application. 511 Mich 913 (2023).

In a unanimous opinion by Justice CAVANAGH, the Supreme Court, in lieu of granting leave to appeal, *held*:

A professional guardian of an incapacitated individual cannot, without executing a power of attorney complying with MCL 700.5103 of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*., lawfully delegate to employees their final decision-making authority over a guardianship "power" that is explicitly listed in MCL 700.5314 or over any guardianship task that alters or impairs the incapacitated individual's rights, duties, liabilities, or legal relations; however, a professional guardian may lawfully have employees assist in exercising a guardianship power and may have employees perform any other guardianship task or duty on behalf of the professional guardian without complying with MCL 700.5103.

1. Under EPIC, a probate court may appoint a guardian to be legally responsible for an incapacitated individual. A guardian may be entitled to reimbursement from an applicable no-fault insurer under MCL 500.3107(1)(a) for guardianship services that are lawfully performed on behalf of an incapacitated individual. MCL 700.5103 prohibits all guardians—including professional guardians—from delegating their guardianship powers for more than 180 days and requires that a guardian who wants to delegate their powers execute a power of attorney and notify the court of the delegation within seven days of execution. In this case, it was undisputed that Findling did not comply with MCL 700.5103 before delegating certain guardianship tasks to employees of his law firm; accordingly, the dispositive question was whether the tasks Findling's employees performed fell within the scope of MCL 700.5103.

2. MCL 700.5314 provides that a guardian of an incapacitated individual has "all of the following powers and duties, to the extent granted by court order," and then provides a lettered list of possible "powers" and "duties" a guardian might have. While many items in the list are explicitly identified as a "power" or a "duty," some items include neither term; additionally, the lettered list in MCL 700.5314 does not provide an exclusive list of tasks a guardian is required or permitted to perform on behalf of an incapacitated individual. Because MCL 700.5314 does not provide an exhaustive list of tasks a guardian is permitted or required to perform, it was proper for the Court of Appeals to consult *Black's Law Dictionary* to assist in understanding

what other guardianship activities fall within the statutorily undefined term "power." However, that definition was insufficient on its own because multiple definitions of "power" could apply, and the alternative definitions are meaningfully distinct. Accordingly, it was necessary to examine the surrounding statutory provisions to define "power" in this context.

3. The Court of Appeals correctly determined that viewed in the broader context of EPIC, the proper definition of "power" that is to be applied to acts outside those explicitly listed in MCL 700.5314 is an act that alters or impairs the rights, duties, liabilities, or legal relations of the incapacitated individual. The listed powers in MCL 700.5314 provide a guardian the authority to (1) handle the incapacitated individual's money and medical care, (2) establish their residence, and (3) institute legal proceedings on their behalf, and the listed "duties" require a guardian to (1) visit and/or consult with the incapacitated individual, that individual's family, and their doctors, (2) care for the ward's property, and (3) make provision for the ward's care, comfort, and maintenance and, when appropriate, arrange for the ward's training and education. The term "power" in this context thus does not refer broadly to a guardian's authority to take actions on behalf of or in lieu of the incapacitated individual. Rather, the "power" that must be delegated pursuant to MCL 700.5103 is a guardian's authority to alter the rights, duties, liabilities, or legal relations of the incapacitated individual. MCL 700.5106(5) and (6) reinforced this conclusion; those provisions explicitly contemplate that a professional guardian will hire employees to assist in performing guardianship duties.

4. However, there is not a bright-line dichotomy between a guardian's powers and duties. Relatedly, a guardian's overarching responsibility for the ward's care, custody, and control necessarily includes both the imposition of certain duties and the grant of certain powers. If a guardian exercises a power to fulfill a duty owed to a ward, then the guardian must comply with MCL 700.5103 to lawfully delegate the exercise of that power. Moreover, MCL 700.5103 only limits common-law agency principles with regard to a guardian's *final decision-making authority* to exercise a power listed in MCL 700.5314 or to approve any other alteration or impairment of the ward's rights, duties, liabilities, or legal relations; MCL 700.5103 does not apply to a professional guardian's use of employees to *assist* in making such a decision, nor does it apply to the use of employees to execute such a decision. Finally, a professional guardian cannot shirk their responsibility for ensuring that a ward receives proper care by using employees; the ultimate responsibility for the ward's custody and care lies with the court-appointed guardian.

5. The Court of Appeals' holdings regarding whether there existed questions of fact in these cases were premature. Accordingly, these holdings were vacated, and the cases were remanded to the probate court for further proceedings. The parties' countermotions for partial summary disposition were brought before the completion of discovery, and the current factual record was limited to short descriptions of the employees' activities in billing statements that were attached to Findling's complaints. Moreover, neither the parties nor the probate court had appellate guidance as to the appropriate framework for assessing whether an employee lawfully performed guardianship tasks when the motions for partial summary disposition were filed and decided. Finally, throughout this litigation, the parties have framed their arguments in broad all-or-nothing terms without reference to the specific entries in Findling's billing statements, and

the probate court's decision was similarly broad in its reasoning.  Under these circumstances, it was appropriate for the parties and probate court to reassess these cases on remand.

Court of Appeals decision and the decisions of the Oakland County Probate Court granting Findling's motions for partial summary disposition and denying Auto-Owners' countermotions for partial summary disposition in both docket numbers vacated; both cases remanded to the Oakland County Probate Court for further proceedings.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED May 28, 2024

STATE OF MICHIGAN

SUPREME COURT

*In re* Guardianship of MARY ANN MALLOY.

DARREN FINDLING, Coguardian of MARY
ANN MALLOY, a legally protected person, and
DARREN FINDLING LAW FIRM, PLC,

Plaintiffs-Appellees,

and

PATRICK MALLOY, Coguardian of MARY
ANN MALLOY, a legally protected person, and
KATHERN MALLOY,

Plaintiffs,

v                                                              No. 165018

AUTO-OWNERS INSURANCE COMPANY,

Defendant-Appellant.

*In re* Guardianship of DANA JENKINS.

DARREN FINDLING, Guardian of DANA
JENKINS, a legally protected person, and
DARREN FINDLING LAW FIRM, PLC,

      Plaintiffs-Appellees,

v                                            No. 165020

AUTO-OWNERS INSURANCE COMPANY,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

      This case raises the important questions of whether and when professional guardians may use employees to perform guardianship tasks on their behalf. While these specific cases are billing disputes between a professional guardian and a no-fault insurer, the issue presented has significant practical implications for the thousands of Michiganders under the care of a professional guardian who, by virtue of their legal incapacitation, are among the most vulnerable groups in our society.[1] The amicus briefs filed in these cases reflect

---

[1] As of the end of 2022, there were over 30,000 adults with a guardian in Michigan. See State Court Administrative Office, *2022 Court Caseload Report: Statewide Probate Court Summary*, p 9, available at <https://www.courts.michigan.gov/48fd7b/siteassets/reports/statistics/caseload/2022/statewide.pdf> (accessed March 4, 2024) [https://perma.cc/VS99-FVKM]. While the Statewide Probate Court Summary does not include the number of adults who have professional guardians, an amicus brief filed by the Michigan Guardianship Association asserts that there are approximately 15,000 professional guardianships in Michigan. Brief for Michigan Guardianship Association as Amicus Curiae (July 27, 2023) (Docket No. 165018) at 14.

the differing views as to whether the use of employees to perform guardianship tasks serves the interests of vulnerable adults who are subject to a professional guardianship.[2]  While this is an important and nuanced policy issue, it is not our role to make this policy choice. Rather, our job is to ascertain and carry into effect the scheme adopted by our Legislature.[3]

We hold that a professional guardian of an incapacitated individual must execute a power of attorney that complies with MCL 700.5103 to lawfully delegate to employees the authority to make any final decision to exercise a guardianship "power" that is explicitly

---

[2] Amicus briefs filed by the Michigan Guardianship Association and the Probate and Estate Planning Section of the State Bar of Michigan note that many professional guardians currently have hundreds of wards under their care.  They argue that, given the myriad tasks a professional guardian is legally required to undertake, it is impractical to require them to personally perform all of them.  They further contend that limiting a professional guardian's ability to delegate all guardianship tasks would create insurmountable administrative and financial burdens.  Ultimately, they contend that such a limitation would harm those subject to a professional guardianship by diminishing both the quality of care provided and the number of individuals who are willing to act as a professional guardian.

By contrast, an amicus brief filed by the Michigan Elder Justice Initiative, the Legal Services Association of Michigan, and the Michigan State Planning Body argues that the use of employees prevents professional guardians from forming the personal relationships that are necessary to understanding an individual's needs and providing proper care.  These amici further contend that the use of employees creates the risk of fraud against incapacitated individuals by individuals falsely claiming to work for the guardian.  Broadly stated, these amici argue that the use of employees to perform tasks specifically entrusted to the guardian results in impersonal and subpar care while also breeding uncertainty as to who is ultimately responsible if guardianship authority is abused or proper care is not provided.

[3] While our decision is based on the statutes currently in effect, we note that the Legislature is considering potential statutory amendments relevant to the issue presented in this appeal, and those changes, if enacted, may further clarify the distinction between "powers" and "duties," specify which actions may be delegated by a professional guardian, and prescribe when such delegations require execution of a formal power of attorney.  See 2023 HB 4909.

listed in MCL 700.5314 or to delegate any other final decision that would alter or impair an incapacitated individual's rights, duties, liabilities, or legal relations. However, a professional guardian need not comply with MCL 700.5103 to use employees to perform any other guardianship task or duty on the guardian's behalf. Moreover, a professional guardian may use employees to *assist* in exercising a guardianship power or to *assist* in deciding how to exercise these powers without complying with MCL 700.5103. A professional guardian who lawfully uses employees nonetheless retains the ultimate legal responsibility for ensuring that all statutory and fiduciary duties owed to an incapacitated individual are fulfilled and that they receive proper care.

We vacate the decision of the Court of Appeals and the decisions of the Oakland County Probate Court granting plaintiffs-appellees' motions for partial summary disposition and denying defendant-appellant's countermotions for partial summary disposition in both docket numbers and remand both cases to the Oakland County Probate Court for further proceedings in light of this opinion.

## I. GUARDIANSHIPS OF INCAPACITATED INDIVIDUALS

Before discussing the facts of this case, it is helpful to provide a brief overview of Michigan's statutory scheme governing guardianships and the role of professional guardians within that scheme. Under the Estates and Protected Individuals Code, MCL 700.1101 *et seq*. (EPIC), a probate court may appoint a guardian to be legally responsible for an incapacitated individual. See MCL 700.5303; MCL 700.5306.[4] An "incapacitated

---

[4] A court may also appoint a guardian for a "minor," defined as "an individual who is less than 18 years of age." MCL 700.1106(c); see also MCL 700.5204. By definition, a "minor" is not an "incapacitated individual" under EPIC, see MCL 700.1105(a); MCL 700.1105(i), and there are separate provisions governing guardianships of minors versus

4

individual" is a person over 17 years old who "lack[s] sufficient understanding or capacity to make or communicate informed decisions." MCL 700.1105(a). Broadly stated, a guardianship is one available legal mechanism for ensuring the safety and well-being of individuals who are not capable of independently making decisions and caring for themselves.[5] In such circumstances, "[a]n individual in his or her own behalf, or any person interested in the individual's welfare, may petition [the probate court] for a finding of incapacity and appointment of a guardian." MCL 700.5303(1).

Despite the significant and necessary role that guardianships may play in the life of an incapacitated individual, it is important to recognize that appointing a guardian deprives an individual of their legal autonomy, often completely and in extremely intimate ways. A guardian is bestowed by statute and court order with myriad duties and powers falling under the broad umbrella of ensuring that an incapacitated individual's needs are met. See

---

guardianships of incapacitated individuals, see MCL 700.5101 *et seq*. (general provisions); MCL 700.5201 *et seq*. (guardians of minors); MCL 700.5301 *et seq*. (guardians of incapacitated individuals). While there are some important differences between guardianships of minors and guardianships of incapacitated persons, there is also overlap. Relevant for our purposes, a professional guardian can be appointed to care for either an incapacitated individual or a minor, see MCL 700.5313; MCL 700.5106(1) and (2), and the provision governing the delegation of guardianship powers—MCL 700.5103—applies to both types of guardians. Because this case only involves guardianships of incapacitated individuals, we do not address whether the statutory provisions uniquely governing guardianships of minors would dictate a different framework for a professional guardian's use of employees to care for a minor.

[5] Other legal options for ensuring the proper care of individuals in need of assistance include, but are not limited to, a "conservator, patient advocate designation, do-not-resuscitate order, physician orders for scope of treatment form, or durable power of attorney . . . ." MCL 700.5303(2).

MCL 700.5314.  Accordingly, a ward[6] may lose legal authority over, among other things, their finances, where they live, and what medical care they receive.  See *id*.  The serious consequences flowing from adult guardianships have led many to fairly characterize them as akin to a "civil death."[7]  In light of the liberty interests at stake, a person for whom a guardian has been sought has statutory rights similar to those of a criminal defendant, including the rights to written notice of a potential guardianship, to present evidence on their behalf, to retained or appointed counsel, and to a jury trial.  See MCL 700.5304; MCL 700.5306a.[8]  A court may only appoint a guardian if the court concludes by clear and

---

[6] EPIC defines "ward" as "an individual for whom a guardian is appointed," MCL 700.1108(a), and therefore the term can encompass both incapacitated individuals *and* minors who are subject to a guardianship.  See note 4 of this opinion.  Because our holding is limited to guardianships of "incapacitated individuals," we use "ward" in this opinion to refer only to such individuals.

[7] See, e.g., Kohn & Koss, *Lawyers for Legal Ghosts: The Legality and Ethics of Representing Persons Subject to Guardianship*, 91 Wash L Rev 581, 582 n 3 (2016) ("[Adult guardianship] is a harsh remedy.  A judgment of interdiction amounts to civil death . . . .") (cleaned up); Cavey, *Realizing the Right to Counsel in Guardianship: Dispelling Guardianship Myths*, 2 Marq Elder's Advisor 26, 28 (2000) (describing guardianship as a "legal death"); Perlin, "*Striking for the Guardians and Protectors of the Mind": The Convention on the Rights of Persons with Mental Disabilities and the Future of Guardianship Law*, 117 Penn St L Rev 1159, 1159 (2013) (describing guardianship as a "civil death"); Salzman & Diller, *Britney Spears' New Lawyer Must Reverse Her 'Civil Death.' She's Been Robbed of Who She Is*, USA Today (July 14, 2021) (opinion piece on a high-profile conservatorship case), available at <https://www.usatoday.com/story/opinion/2021/07/14/britney-spears-wins-back-constitutional-right-choose-lawyer/7965211002/> [https://perma.cc/34TK-3TGN].

[8] As summarized in greater detail by one Court of Appeals panel:

> EPIC provides specific procedures for determining whether an individual is legally incompetent, including provisions providing for the appointment of a guardian ad litem to represent the allegedly incapacitated individual upon the filing of the petition, MCL 700.5303(3); requiring the court to conduct a hearing on the issue of incapacity, MCL 700.5303(3); entitling the alleged incapacitated individual to secure his own independent evaluation, to be

6

convincing evidence—"the most demanding standard applied in civil cases," *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995)—that an individual fits the definition of an "incapacitated individual" and that "appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual . . . ." MCL 700.5306(1).

An appointed guardian exercises legal authority on behalf of, and in the best interests of, the incapacitated individual. See MCL 700.5306(1); MCL 700.5314. The scope of a guardian's authority must be tailored to the specific needs of the incapacitated individual. "The court shall grant a guardian only those powers and only for that period of time as is necessary to provide for the demonstrated need of the incapacitated individual." MCL 700.5306(2). If the individual "lacks the capacity to do some, but not all, of the tasks necessary to care for himself or herself, the court may appoint a limited guardian to provide guardianship services to the individual . . . ." MCL 700.5306(3). However, "[i]f . . . the individual is incapacitated and is totally without capacity to care for himself or herself, the court . . . may appoint a full guardian." MCL 700.5306(4). The powers granted to a guardian define the scope of the guardian's responsibilities toward the incapacitated

---

present at the hearing, to be represented by legal counsel, to present evidence and cross-examine witnesses, and to a trial by jury, MCL 700.5304(2), (4) & (5); and providing that the court "may appoint a guardian if the court finds by clear and convincing evidence both that the individual for whom a guardian is sought is an incapacitated individual and that the appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual[.]" MCL 700.5306(1). See also, MCL 700.5306a specifying the rights of an individual for whom guardianship is sought. See MCL 700.5406 for similar provisions regarding a petition to appoint a conservator for an allegedly incapacitated individual. [*Bacon v Zappia*, unpublished per curiam opinion of the Court of Appeals, issued November 17, 2015 (Docket No. 323570), p 4 n 2.]

individual. See MCL 700.5314 ("To the extent a guardian of a legally incapacitated individual is granted powers by the court under [MCL 700.5306], the guardian is responsible for the ward's care, custody, and control . . . ."). These statutory obligations give rise to a fiduciary duty to act in the ward's best interests. See MCL 700.1104(e) (defining "fiduciary" to include guardians); *In re Karmey Estate*, 468 Mich 68, 74 n 2; 658 NW2d 796 (2003) (" '[F]iduciary relationships—such as . . . guardian-ward . . . —require the highest duty of care.' "), quoting *Black's Law Dictionary* (7th ed).

In determining whom to appoint as guardian, a court must give first preference to an incapacitated individual's desires and then look to that individual's family members. See MCL 700.5313(2) and (3). This priority scheme is consistent with the intimate and personal nature of a guardianship. If no one falling within these categories is "suitable or willing to serve" as guardian, "the court may appoint any competent person who is suitable and willing to serve, including a professional guardian as provided in [MCL 700.5106]." MCL 700.5313(4). A "professional guardian" is "a person that provides guardianship services for a fee." MCL 700.1106(w). Professional guardians generally have no preexisting relationship with a ward before they are appointed, and they are often responsible for more than one ward, with some professional guardians having hundreds of wards under their care at any given time. *Id*.; Brief for the Probate and Estate Planning Section of the State Bar of Michigan as Amicus Curiae (July 26, 2023) (Docket No. 165018) at 15.

Before appointing a professional guardian, a court must "find[] on the record" that (1) appointing a professional guardian is in the ward's best interests and (2) "[t]here is no other person that is competent, suitable, and willing to serve in that fiduciary capacity . . . ."

8

MCL 700.5106(2); see also *In re Gerstler Guardianship/Conservatorship*, 324 Mich App 494, 512-514; 922 NW2d 168 (2018) (holding that the probate court erred by appointing a professional guardian without making any factual finding that a person higher in the priority scheme was unable or unwilling to serve as guardian). In practical terms, this means that professional guardians are most often appointed as a last resort when an incapacitated individual has no one else in their life who is able and willing to accept the responsibility of a guardianship.

## II. FACTUAL AND PROCEDURAL BACKGROUND

These cases involve billing disputes between plaintiff-appellee Darren Findling—an attorney and professional guardian—and defendant-appellant, Auto-Owners Insurance Company.[9] In 2019, Findling was appointed to serve as the guardian for Dana Jenkins and as coguardian for Mary Ann Malloy, both of whom suffered serious injuries in automobile crashes that rendered them legally incapacitated. Both Jenkins and Malloy receive no-fault benefits from Auto-Owners. In 2019 and 2020, Findling, along with employees of his law firm, provided various guardianship services to Malloy and Jenkins, including guardian visits and meetings with physicians, case managers, the Social Security Administration, and their banks. Findling sought reimbursement from Auto-Owners for these and other

---

[9] Findling's law firm—The Darren Findling Law Firm, PLC—is also a named plaintiff in these cases. In the action seeking reimbursement for guardianship services related to Mary Ann Malloy, Malloy's current and former coguardians—Patrick and Kathern Malloy—were also named plaintiffs at various times, but they are not parties to this appeal. The complaints in these cases alleged that The Darren Findling Law Firm represents Findling and Patrick and Kathern Malloy in their roles as fiduciaries. This opinion refers only to Findling for ease of reference.

9

services under MCL 500.3107(1)(a). Auto-Owners declined to reimburse for the services that were performed by the employees of Findling's law firm.

Findling filed two lawsuits against Auto-Owners in his guardianship capacity, seeking reimbursement for the guardianship services performed for Malloy and Jenkins by employees of his law firm.[10] In its answers, Auto-Owners raised as affirmative defenses that the care and services provided were not lawfully rendered. In both cases, Findling filed early motions for partial summary disposition under MCR 2.116(C)(9) (failure to state a valid defense to a claim) and (C)(10) (no genuine issue of material fact) solely on the issue of whether Auto-Owners was required to reimburse for guardianship services performed by employees of his law firm, and Auto-Owners filed countermotions for summary disposition on the same issue under MCR 2.116(I)(2). Auto-Owners argued that it was not required to reimburse for such services because Findling had not complied with MCL 700.5103, which restricts the delegation of guardianship "powers" to fewer than 180 days and requires a valid power of attorney and notice to the court. Findling countered that he only delegated his guardianship duties—but not his powers—to employees of his law firm and therefore he was not required to comply with MCL 700.5103. He further argued that he was legally permitted to have employees perform guardianship duties under MCL 700.5106(5) and (6).

---

[10] In support of the complaints in these cases, Findling submitted invoices from The Probate Pro, a division of The Darren Findling Law Firm, PLC, reflecting charges for services provided by both Darren Findling and employees of his law firm. Specifically, with respect to Mary Ann Malloy, the invoices reflected 56 hours of services provided by employees and 0.5 hours of services provided by Darren Findling. With respect to Dana Jenkins, the invoices reflected 150.8 hours of services provided by employees and 1.2 hours of services provided by Darren Findling.

The probate court heard oral argument on the motions in both cases together and agreed with Findling. The court therefore granted Findling's partial motions for summary disposition and denied Auto-Owners' countermotions for partial summary disposition. Auto-Owners filed interlocutory applications for leave to appeal in both cases, which the Court of Appeals originally denied "for failure to persuade the Court of the need for immediate appellate review."[11] Auto-Owners sought leave to appeal in this Court, and we remanded both cases to the Court of Appeals for consideration as on leave granted.[12] On remand, the Court of Appeals consolidated the two appeals[13] and affirmed in part and reversed in part. *In re Guardianship of Malloy*, 343 Mich App 548; 997 NW2d 733 (2022).

The Court of Appeals found it significant that EPIC distinguishes between a guardian's "powers" and "duties," see MCL 700.5314, but that MCL 700.5103 only refers to the delegation of a guardian's "powers." *Id*. at 561-565, 569. Accordingly, the panel held that a guardian is only required to comply with MCL 700.5103 to lawfully delegate guardianship "powers," which it defined as tasks that "alter the 'rights, duties, liabilities, or other legal relations' " of an incapacitated individual. *Id*. at 565, quoting *Black's Law Dictionary* (11th ed). Under this framework, the Court of Appeals concluded that there was no question of fact that Findling largely delegated guardianship duties—but not

---

[11] *In re Guardianship of Malloy*, unpublished order of the Court of Appeals, entered September 13, 2021 (Docket No. 358006); *In re Guardianship of Jenkins*, unpublished order of the Court of Appeals, entered September 13, 2021 (Docket No. 358021).

[12] *In re Guardianship of Malloy*, 509 Mich 880 (2022); *In re Guardianship of Jenkins*, 509 Mich 880 (2022).

[13] *In re Guardianship of Malloy*, unpublished order of the Court of Appeals, entered July 5, 2022 (Docket Nos. 358006 and 358021).

powers—to his employees. *Id*. at 565, 567. The panel concluded that employees attending meetings with doctors, the Social Security Administration Office, and Malloy's and Jenkins's banks, among other tasks, were proper delegations of guardianship "duties" rather than guardianship "powers." *Id*. at 565-567. However, the Court of Appeals held that there remained questions of fact as to whether Findling unlawfully delegated his "powers" by allowing employees to prepare for and attend hearings regarding the modification of Malloy's and Jenkins's guardianships. *Id*. at 570.

Defendant again sought leave to appeal in this Court. We ordered oral argument on the application and directed the parties to address

> whether the Court of Appeals properly construed and applied the relevant provisions of the Estates and Protected Individuals Code, MCL 700.1101 *et seq*., in determining that there is a genuine issue of material fact whether the guardianship services provided by the appellee and the appellee firm were "lawfully rendered" so as to be payable under MCL 500.3107 of the no fault act, MCL 500.3101 *et seq*. [*In re Guardianship of Malloy*, 511 Mich 913, 913 (2023).]

## III. STANDARD OF REVIEW

We review de novo questions of statutory interpretation and whether a trial court properly granted summary disposition. See *Jesperson v Auto Club Ins Ass'n*, 499 Mich 29, 34; 878 NW2d 799 (2016).

## IV. ANALYSIS

The parties do not dispute that a guardian may be entitled to reimbursement from an applicable no-fault insurer under MCL 500.3107(1)(a) for guardianship services that are lawfully performed on behalf of an incapacitated individual. See *Heinz v Auto Club Ins Ass'n*, 214 Mich App 195, 198; 543 NW2d 4 (1995) (holding that services performed by a

guardian are allowable expenses under MCL 500.3107(1)(a)).  The question in these cases is whether a professional guardian may lawfully delegate guardianship tasks to employees without complying with MCL 700.5103.  Answering this question requires an examination of how common-law agency principles apply to guardianships in light of the relevant EPIC provisions.

## A.  COMMON-LAW AGENCY PRINCIPLES

Under the common law, "whatever a person may lawfully do if acting in his own right and on his own behalf he may lawfully delegate to an agent."  *Link, Petter & Co v Pollie*, 241 Mich 356, 359-360; 217 NW 60 (1928) (citation omitted).  This common-law principle may apply even if an exhaustive statutory scheme that did not exist under the common law is silent as to whether delegation is permitted.  See generally *Wigfall v Detroit*, 504 Mich 330; 934 NW2d 760 (2019) (applying established agency principles to the notice requirements to overcome governmental immunity).  This principle reflects "the practical reality" and common understanding that people often cannot feasibly *personally* perform all tasks that are required of them.  *Id*. at 343.  Moreover, delegation in some contexts can provide societal benefits related to specialization and efficiency.[14]  One common category of agency–principal relationship is that of an employer and an employee.  See *Chambers v Trettco*, *Inc*, 463 Mich 297, 310; 614 NW2d 910 (2000).

---

[14] See Mushkat & Mushkat, *The Challenge of COVID-19 and the World Health Organization's Response: The Principal-Agent Model Revisited*, 36 Am U Int'l L Rev 487, 521 (2021); 1 Ries, Regulation of Investment Management & Fiduciary Services (July 2021 update), § 14:5.

But the use of an agent is not a get-out-of-jail-free card that relieves the principal of their legal responsibilities. When an agent acts within the express or implied scope of their authority, the principal is responsible for the agent's improper exercise of that authority. See, e.g., *Rogers v J B Hunt Transp, Inc*, 466 Mich 645, 652; 649 NW2d 23 (2002). In other words, an agent's acts that fall within the scope of authority granted to the agent are considered to be "functionally interchangeable" with acts directly performed by the principal. *Wigfall*, 504 Mich at 349 (MCCORMACK, C.J., concurring); see also *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 11; 651 NW2d 356 (2002). The principal's responsibility for an agent's actions flows from the agent's exercise of authority provided by, or exercised on behalf of, the principal. See *Chambers*, 463 Mich at 311; *Smith v Webster*, 23 Mich 298, 300 (1871) ("The employer, who leaves to his subordinates a discretion which they abuse, is responsible as if he had approved their action.").

## B. DELEGATION OF GUARDIANSHIP TASKS

Notwithstanding common-law agency principles, the Legislature has recognized unique concerns in the guardianship context that justify limiting a guardian's ability to enlist an agent to perform guardianship tasks on the guardian's behalf. In particular, MCL 700.5103 provides, in pertinent part:

> (1) By a properly executed power of attorney, a parent or guardian of a minor or a guardian of a legally incapacitated individual may delegate to another person, for a period not exceeding 180 days, any of the parent's or guardian's powers regarding care, custody, or property of the minor child or ward, except the power to consent to adoption of a minor ward or to release of a minor ward for adoption.

\* \* \*

14

(4) If a guardian for a minor or legally incapacitated individual delegates any power under this section, the guardian shall notify the court within 7 days after execution of the power of attorney and provide the court the name, address, and telephone number of the attorney-in-fact.

This provision prohibits all guardians—including professional guardians—from delegating their guardianship "powers" for more than 180 days.[15] Moreover, it requires a guardian who wants to delegate their "powers" to execute a power of attorney and notify the court of the delegation within 7 days of execution. It is undisputed in this case that Findling did not comply with MCL 700.5103 before delegating certain guardianship tasks to employees of his law firm. So the dispositive question is whether the tasks those employees performed fall within the scope of MCL 700.5103.

Like the Court of Appeals, we find it significant that MCL 700.5103 only addresses delegation of a guardian's "powers," which suggests that MCL 700.5103 does not apply to the delegation of guardianship tasks that are not "powers." See *Detroit v Redford Twp*, 253 Mich 453, 456; 235 NW 217 (1931) (noting the presumption that the "[e]xpress mention in a statute of one thing implies the exclusion of other similar things"). We further agree with the Court of Appeals that the Legislature's use of "power" in other EPIC provisions governing guardianships helps illuminate the meaning of "power" in MCL 700.5103. See *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 367 n 16; 917 NW2d 603 (2018) (recognizing that

---

[15] MCL 700.5103(1) uses the term "may," which "is ordinarily considered to be permissive." *James Twp v Rice*, 509 Mich 363, 372; 984 NW2d 71 (2022). But as this Court has recognized, "this does not end the inquiry because it is necessary to ascertain to whom the statute gives that discretion." *Id*. Similarly, it is also necessary to specify *what action* the statute makes discretionary. In this context, the word "may" signifies only that a guardian's decision to delegate is discretionary, not that a guardian can delegate their "powers" without complying with MCL 700.5103.

interpreting a statutory term "requires consideration of the relationship of text within a single statutory provision as well as its relationship to the text of other provisions within the same act").

MCL 700.5314 provides that "a guardian [of an incapacitated individual] has all of the following powers and duties, to the extent granted by court order," and then provides a lettered list of possible "powers" and "duties" a guardian might have. See, e.g., MCL 700.5314(d) (providing a guardian "[t]he power to execute, reaffirm, and revoke a do-not-resuscitate order on behalf of a ward"); MCL 700.5314(b) (imposing "the duty to make provision for the ward's care, comfort, and maintenance"). While many items in the list are explicitly identified as a "power" or a "duty," some items include neither term. See, e.g., MCL 700.5314(a) (providing that "[t]he guardian shall visit the ward" at least once every three months).[16] We have little trouble concluding that if MCL 700.5314 explicitly identifies something as a "power" of the guardian, then it falls within the scope of limitations in MCL 700.5103 on the delegation of a guardian's "powers." See *Arrowhead Dev Co v Livingston Co Rd Comm*, 413 Mich 505, 516; 322 NW2d 702 (1982) (explaining

---

[16] MCL 700.5314 further provides various actions that a guardian "shall not" take. See, e.g., MCL 700.5314(d)(*i*) and (*ii*) (providing that a guardian "shall not execute a do-not-resuscitate order unless the guardian" consults with the incapacitated individual and their attending physician). By its nature, a prohibition on conduct cannot be delegated. Any delegation of guardianship authority is necessarily subject to any limitation that would apply if that task were performed by the guardian, regardless of whether a formal delegation under MCL 700.5103 is required; a principal cannot delegate authority they themselves lack. See *Link, Petter & Co*, 241 Mich at 359-360 ("[W]hatever a person may *lawfully* do if acting in his own right and on his own behalf he may lawfully delegate to an agent.") (citation omitted; emphasis added).

that statutory terms "must be assigned such meanings as are in harmony with the whole of the statute").

However, this is not the end of the story. The lettered list in MCL 700.5314 does not provide an exclusive list of tasks a guardian is required or permitted to perform on behalf of an incapacitated individual. In relevant part, MCL 700.5314 provides:

> To the extent a guardian of a legally incapacitated individual is granted powers by the court under [MCL 700.5306], the guardian is responsible for the ward's care, custody, and control . . . . *In particular and without qualifying the previous sentences*, a guardian has all of the following powers and duties, to the extent granted by court order[.] [Emphasis added.]

Thus, MCL 700.5314 provides that a guardian has an overarching "responsib[ility] for the ward's care, custody, and control" and then provides a *nonexhaustive* list of "powers and duties" that might fall under that umbrella. And the reality is that a guardian's obligation to care for an incapacitated individual varies on an individual basis and may require a guardian to perform tasks that are not explicitly listed in MCL 700.5314. The question then becomes to what extent compliance with MCL 700.5103 is necessary to delegate guardianship tasks that are not explicitly listed in MCL 700.5314. In other words, how do we identify whether a task that is not explicitly identified as a "power" in MCL 700.5314 is nonetheless a "power" of the guardian that must be formally delegated under MCL 700.5103?

In defining the scope of a guardian's "powers," the Court of Appeals noted that EPIC does not define the word "power" and therefore turned to *Black's Law Dictionary* (11th ed), which defines "power" as:

> **1.** The ability to act or not act; esp., a person's capacity for acting in such a manner as to control someone else's responses. **2.** Dominance, control, or

17

influence over another; control over one's subordinates. **3.** The legal right or authorization to act or not act; a person's or organization's ability to alter, by an act of will, the rights, duties, liabilities, or other legal relations either of that person or of another.

Because MCL 700.5314 does not provide an exhaustive list of tasks a guardian is permitted or required to perform, it was proper for the Court of Appeals to consult a dictionary to assist in understanding what other guardianship activities fall within the statutorily undefined term "power." See *Champine v Dep't of Transp*, 509 Mich 447, 453-454; 983 NW2d 741 (2022). Moreover, we agree with the Court of Appeals that this dictionary definition is helpful in resolving this case.[17]

However, this definition is insufficient on its own because there are multiple definitions of "power" that could conceivably apply, and the alternative definitions are meaningfully distinct. There is a significant difference between broadly defining a guardian's "powers" that must be delegated under MCL 700.5103 as a guardian's "legal right or authorization to act" on a ward's behalf and defining it more narrowly as the "ability to alter . . . the rights, duties, liabilities, or other legal relations" of a ward. *Black's*

_____

[17] Generally, resort to a legal dictionary is most helpful if a word is used as a legal term of art. See, e.g., *Sanford v Michigan*, 506 Mich 10, 21; 954 NW2d 82 (2020). "This is because the common and approved usage of a nonlegal term is most likely to be found in a standard dictionary, not in a legal dictionary." *People v Thompson*, 477 Mich 146, 152; 730 NW2d 708 (2007). However, many words are defined in both lay and legal dictionaries, and it is not always clear whether the Legislature intended for a term to bear its plain meaning or a specialized legal meaning. As discussed later, the statutory scheme indicates that the term "powers" in this context refers to a guardian's authority to alter the rights, duties, liabilities, or legal relations of the incapacitated individual, which is consistent with one definition of that term in *Black's Law Dictionary*. Neither the parties nor the lower courts cite a lay dictionary definition of "power," let alone cite a lay dictionary definition that is more consistent with the statutory context than the applicable definition in *Black's Law Dictionary*. Accordingly, we conclude that resort to a legal dictionary is appropriate and sufficient in this case.

*Law Dictionary* (11th ed). Accordingly, it is necessary to examine the surrounding statutory provisions to determine what "power" means in *this* context. See, e.g., *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 307; 952 NW2d 358 (2020) ("A statute should be interpreted in light of the overall statutory scheme, and although a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context.") (quotation marks, citation, and brackets omitted).

Viewed in the broader context of EPIC, we agree with the Court of Appeals that the proper definition of "power" that is to be applied to acts outside those explicitly listed in MCL 700.5314 is an act that alters or impairs the rights, duties, liabilities, or legal relations of the incapacitated individual. As summarized by the Court of Appeals:

> A guardian's powers to the extent granted by the court under MCL 700.5306 include the power to establish the ward's residence, MCL 700.5314(a); give consent or approval to enable the ward to receive medical care, mental health care, professional care, counseling, treatment, or service, MCL 700.5314(c); execute, reaffirm, and revoke a ward's do-not-resuscitate order with some requirements, MCL 700.5314(d); execute, reaffirm, and revoke a ward's nonopioid directive, MCL 700.5314(f); execute, reaffirm, and revoke a physician's orders for scope of treatment for the ward with some requirements, MCL 700.5314(g); and take action to compel persons responsible to support the ward, to pay money for the ward's welfare, and apply money and property for the ward's support, care, and education, MCL 700.5314(i).
>
> A guardian's duties include being responsible for the ward's care, custody, and control and communicating and consulting with the ward if possible before making decisions. MCL 700.5314. A guardian also has the duty to make provisions for the ward's care, comfort, maintenance, and, when appropriate, education; secure services for the ward's mental and physical well-being; and care for and protect the ward's personal and real property or dispose of it if in the ward's best interests. MCL 700.5314(b). Further, if a guardian executes a do-not-resuscitate order, the guardian has the duty to visit, communicate, and consult with the ward and consult directly

19

with the ward's attending physician. MCL 700.5314(d). Similarly, respecting physician orders for scope of treatment, a guardian has the duty to visit, communicate, and consult with the ward about such orders. MCL 700.5314(h). A guardian has the duty to report at least annually the condition of the ward and the ward's estate to the court. MCL 700.5314(j). Under MCL 700.5106(6), among other duties, a professional guardian appointed by the court has the duty to "ensure that there are a sufficient number of employees assigned to the care of wards for the purpose of performing the necessary duties associated with ensuring that proper and appropriate care is provided." [*In re Guardianship of Malloy*, 343 Mich App at 561-563.]

In broad strokes, the listed "powers" provide a guardian the authority to (1) handle the incapacitated individual's money and medical care, (2) establish their residence, and (3) institute legal proceedings on their behalf. The listed "duties" require a guardian to (1) visit and/or consult with the incapacitated individual, that individual's family, and their doctors, (2) care for the ward's property, and (3) "make provision for the ward's care, comfort, and maintenance and, when appropriate, arrange for the ward's training and education." MCL 700.5314(b). The term "power" in this context thus does not refer broadly to a guardian's authority to take actions on behalf of or in lieu of the incapacitated individual. Rather, the "power" that must be delegated pursuant to MCL 700.5103 is a guardian's authority to alter the rights, duties, liabilities, or legal relations of the incapacitated individual.

This conclusion is reinforced by MCL 700.5106, which specifically governs professional guardians. MCL 700.5106 provides, in relevant part:

(5) A professional guardian appointed under this section shall establish and maintain a schedule of visitation so that *an individual associated with the professional guardian who is responsible for the ward's care* visits the ward within 3 months after the professional guardian's appointment and not less than once within 3 months after each previous visit.

20

(6) A professional guardian appointed under this section shall ensure that there are *a sufficient number of employees assigned to the care of wards for the purpose of performing the necessary duties associated with ensuring that proper and appropriate care is provided*. [Emphasis added.]

These provisions explicitly contemplate that a professional guardian will hire employees to assist in performing guardianship duties. We find it unlikely that the Legislature, in requiring a professional guardian to hire sufficient employees to assist in performing the necessary duties for a ward, intended that the ability to use such employees would be contingent on a statutory provision governing the delegation of guardianship "powers" that requires the execution of a power of attorney (perhaps a power of attorney for *every* employee used) every six months. Accordingly, these provisions further support interpreting "powers" in this context in a narrower sense as referring only to "powers" explicitly listed in MCL 700.5314 and to any guardianship act that would alter the rights, duties, liabilities, or legal relations of the incapacitated individual. As applied to this case, we agree with the Court of Appeals that a decision to seek an alteration of who is to serve as a ward's guardian or coguardian—an act that is not explicitly listed in MCL 700.5314—is the exercise of a guardianship "power" because changing a ward's guardian alters the ward's rights and legal relations.

We clarify a few points. We do not hold that there is a bright-line dichotomy between a guardian's powers and duties. Many guardianship duties implicitly require a grant of power in the broadest sense, i.e., the legal authority to act, and the grant of guardianship powers necessarily results in certain statutory and fiduciary duties. See MCL 700.5314 (explaining that the court grants a guardian "powers" and that a guardian has "all of the following powers *and duties*, to the extent granted by court order") (emphasis

added). Relatedly, a guardian's overarching "responsib[ility] for the ward's care, custody, and control" necessarily includes both the imposition of certain duties and the grant of certain powers. *Id*. If a guardian exercises a "power" as defined in this opinion to fulfill a duty owed to a ward, then the guardian must comply with MCL 700.5103 to lawfully delegate the exercise of that power. Auto-Owners is thus correct that a guardian's powers and duties often overlap. Our holding is simply that the relevant EPIC provisions use the term "power" to refer only to a subset of a guardian's broader authority and that MCL 700.5103 does not apply to delegations of any *other* guardianship authority or duty.

Moreover, MCL 700.5103 only limits common-law agency principles with regard to a guardian's *final decision-making authority* to exercise a power listed in MCL 700.5314 or to approve any other alteration or impairment of the ward's rights, duties, liabilities, or legal relations. MCL 700.5103 does not apply to a professional guardian's use of employees to *assist* in making such a decision, nor does it apply to the use of employees to execute such a decision. For example, one of a guardian's "powers" is "to establish the ward's place of residence . . . ." MCL 700.5314(a). Thus, a professional guardian must personally make the final decision regarding where to establish a ward's residence unless the guardian complies with MCL 700.5103 to formally delegate that power to someone else. However, a delegation under MCL 700.5103 is not required for a professional guardian to hire someone knowledgeable about residential options to advise the professional guardian regarding possible housing for their wards. Relatedly, a formal delegation is not required to have an employee, at the request of the professional guardian and with their prior approval, take the steps necessary to carry out the guardian's choice in securing a new residence for a ward. MCL 700.5103 limits a guardian's ability to make

22

someone else the de facto guardian with ultimate decision-making authority as to what is necessary to provide proper care for a ward, but it does not limit the use of employees to perform tasks that help a guardian fulfill their "responsib[ility] for the ward's care, custody, and control . . . ." MCL 700.5314; see also MCL 700.5106(5) and (6).

Finally, we caution that, at least in the absence of a formal delegation of guardianship powers under MCL 700.5103, we see no reason why the common-law doctrine that imputes to employers the actions of their employees would not apply with equal force to a professional guardian. See, e.g., *Rogers*, 466 Mich at 652. Thus, professional guardians should be careful when entrusting others to perform guardianship tasks on their behalf and should anticipate being held legally responsible if an employee fails to adequately perform guardianship tasks or otherwise abuses the authority entrusted to them. Under EPIC, a court bestows authority on the guardian, thereby creating a fiduciary relationship rendering that individual responsible for ensuring that a ward receives proper care. See MCL 700.1104(e); *In re Karmey Estate*, 468 Mich at 74 n 2. A professional guardian cannot shirk that responsibility by using employees; the ultimate responsibility for the ward's custody and care lies with the court-appointed guardian.

## C. APPLICATION

In these cases, the Court of Appeals held that there remained questions of fact as to whether Findling unlawfully delegated his "powers" by allowing employees to prepare for and attend hearings regarding the modification of Malloy's and Jenkins's guardianships. However, the panel concluded that there were no questions of fact that all the other tasks performed by employees of Findling's law firm—such as attending meetings with doctors,

23

the Social Security Administration Office, and Malloy's and Jenkins's banks—were lawfully rendered because these tasks did not constitute the exercise of guardianship powers. We believe that these holdings were premature. Accordingly, we vacate these holdings and remand this case to the probate court for further proceedings in light of this opinion.

The parties' countermotions for partial summary disposition were brought before the completion of discovery, and the current factual record appears limited to short descriptions of the employees' activities in billing statements that were attached to Findling's complaints. Moreover, neither the parties nor the probate court had appellate guidance as to the appropriate framework for assessing whether an employee lawfully performed guardianship tasks when the motions for partial summary disposition were filed and decided. Finally, throughout this litigation, the parties have framed their arguments in broad all-or-nothing terms without reference to the specific entries in Findling's billing statements, and the probate court's decision was similarly broad in its reasoning. Under these circumstances, we decline to engage in a line-by-line analysis of Findling's billing statements in the first instance. Instead, we find it appropriate for the parties and probate court to reassess these cases in light of this opinion.

To assist the parties and probate court on remand, we note the apparent limitations of the current factual record. The billing statements attached to Findling's complaints contain only brief descriptions of the guardianship tasks that were performed. For example, in one entry in a billing statement attached to the complaint, Findling seeks compensation for "Preparation for meeting at Medical Alternatives. Teem [sic] meeting at Medical Alternatives regarding Mary [Ann Malloy]'s care, recovery, and rehabilitation." The Court

24

of Appeals characterized this entry, and other similar ones, as delegating to employees the task of "attending meetings with Malloy's doctors," which it concluded did not involve the exercise of a guardianship "power" because this task did not involve an alteration or impairment of Malloy's rights, duties, liabilities, or legal relations. *In re Guardianship of Malloy*, 343 Mich App at 565.

However, MCL 700.5314(c) provides that a guardian has "[t]he *power* to give consent or approval that is necessary to enable the ward to receive medical, mental health, or other professional care, counsel, treatment, or service." (Emphasis added.) It seems at least possible that a "meeting . . . regarding Mary's care, recovery, and rehabilitation" could include the exercise of a guardian's "powers" if, for example, at that meeting the employee gave consent for Malloy to receive medical treatment. If so, the question would be whether Findling was the final decision-maker for approving that treatment or whether Findling improperly delegated that decision to the employee. By contrast, if at that meeting the employee only gathered information relevant to Malloy's medical care but approved no actual change in that care, then the employee was not unlawfully exercising Findling's guardianship "powers."

To take another example, the Court of Appeals held that there remained questions of fact as to whether Findling improperly delegated his "powers" by allowing employees to prepare for and attend hearings regarding the modification of Malloy's and Jenkins's guardianships on April 23, 2019, and April 24, 2019. As already stated, we agree with the Court of Appeals that modifying a ward's guardianship alters the ward's rights, duties, liabilities, or legal relations, and therefore the decision to seek such a change is the exercise

25

of a guardianship "power." However, the billing entries describing these activities are unclear as to whether the employees' activities involved the exercise of Findling's powers.

The April 23, 2019 billing entries for both Malloy and Jenkins state only that an employee "[p]repared for hearing in Oakland County Probate Court," and the April 24, 2019 billing entries state little more than that the employees attended hearings on the petitions to modify the guardianships and "[a]ttended to necessary follow up." Standing alone, these entries do not indicate whether the result of these hearings was to alter the terms of Malloy's or Jenkins's guardianships.[18] Moreover, these entries do not indicate whether Findling was personally aware of the proceedings or whether Findling was the ultimate decision-maker as to what guardianship arrangements to advocate for on behalf of Malloy and Jenkins.

As stated earlier, we do not decide in this opinion whether, on the current record, either party is entitled to partial summary disposition as to all or some of the services performed by employees of Findling's law firm. Instead, we leave that for the probate court to assess on remand in light of this opinion and with the assistance of more-focused party argument.

## V. CONCLUSION

We hold that a professional guardian cannot, without complying with MCL 700.5103, lawfully delegate to employees their final decision-making authority over a

---

[18] The April 24, 2019 entry in Jenkins's billing statement includes the following phrase: "Task to Sharon to serve Order." The "Order" mentioned here presumably refers to an order entered at the hearing on the petition to modify the guardianship. But that entry does not indicate the content of any order that was entered or to whom that order was to be served.

26

guardianship "power" that is explicitly listed in MCL 700.5314 or over any guardianship task that alters or impairs an incapacitated individual's rights, duties, liabilities, or legal relations. However, a professional guardian may lawfully have employees *assist* in exercising a guardianship power and may have employees perform any other guardianship task on behalf of the professional guardian. We vacate the decision of the Court of Appeals and the decisions of the Oakland County Probate Court granting Findling's motions for partial summary disposition and denying Auto-Owners' countermotions for partial summary disposition in both docket numbers and remand both cases to the Oakland County Probate Court for further proceedings in light of this opinion.

> Megan K. Cavanagh
> Elizabeth T. Clement
> Brian K. Zahra
> David F. Viviano
> Richard H. Bernstein
> Elizabeth M. Welch
> Kyra H. Bolden

27